**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Felipe LOPEZ, Jr., Defendant-Appellant.**

**No. 76–4059.**

United States Court of Appeals, Fifth Circuit.

Dec. 12, 1977.

---

Kenneth L. Sanders, Houston, Tex., for defendant-appellant.

J. A. Canales, U. S. Atty., Anna E. Stool, Rene Gonzalez, George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before GOLDBERG and MORGAN, Circuit Judges, and WYZANSKI *, District Judge.

GOLDBERG, Judge:

Appellant Lopez complains that the roving border patrol stop of his vehicle violated the fourth amendment. We agree that the district court should have granted his motion to suppress and reverse his conviction for possession of marijuana with intent to distribute. 21 U.S.C. § 841(a)(1).

Two border patrol agents were driving south on Highway 16 when they stopped for the red light at the intersection of Highway 359. Reference to the map printed as footnote two of this Court's opinion in *United States v. Shields*, 534 F.2d 605, 607 n. 2 (5th Cir. 1976), reveals that this intersection at Hebbronville, Texas is 55 miles from the border town of Zapata, where Highway 16 originates, and 54 miles from the border town of Laredo, where Highway 359 originates. Appellant, who was traveling north on Highway 16, stopped for the same traffic light across the intersection from the agents.

The agents testified that they became suspicious when appellant avoided making eye contact with them. They noticed that appellant's vehicle had Harris County (Houston) license plates, indicating that the car was registered over 300 miles from Hebbronville. When appellant turned right, the agents followed him and observed that his car was riding high in the rear. They then noticed that the car had air shock absorbers that appeared to be new. Based upon these facts, they stopped appellant's car. They then detected the odor of marijuana, searched the car, and uncovered the incriminating evidence.

I. The Legal Standard

The issue before us is whether the stop of appellant's car complied with fourth amendment mandates. The governing standards have been set forth in several recent Supreme Court and Fifth Circuit border search decisions.

Agents need not have probable cause or reasonable suspicion in order to stop and search at the border or its functional equivalent. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272–273, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Alvarez-Gonzalez*, 542 F.2d 226 (5th Cir. 1976). At permanent checkpoints agents may make stops without probable cause or reasonable suspicion, *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), but they must have probable cause in order to search, *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 46 L.Ed.2d 623 (1975). Officers on roving patrols, however, may stop vehicles "only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). Officers on roving patrol may search only on the basis of probable cause. *Almeida-Sanchez v. United States, supra*, 413 U.S. at 273, 93 S.Ct. 2535.

*Brignoni-Ponce* provides the governing standard in the case at bar. The government does not and could not contend that the intersection at Hebbronville was

---

* Senior United States District Judge, District of Massachusetts, sitting by designation.

either a permanent checkpoint or the functional equivalent of the border. We are thus faced with the stop of a vehicle by a roving patrol. We must decide whether the officers' observations reasonably warranted suspicion that appellant's vehicle contained aliens who were illegally in the country. In answering this question, we must consider the totality of circumstances confronting the officers at the time. *Brignoni-Ponce, supra,* 422 U.S. at 885 n. 10, 95 S.Ct. 2574. We conclude that the agents' observations fell far short of that standard.

In *United States v. Escamilla,* 560 F.2d 1229 (5th Cir. 1977), we were recently faced with a fact situation strikingly similar to the one at bar. There a truck was stopped by federal agents near the same intersection in Hebbronville as the stop in the instant case, and almost 3,000 pounds of marijuana were seized. Allegedly suspicious circumstances included out-of-county license plates, failure to make eye contact, and the fact that the bales of hay loaded in the truck were stacked in such a way that illegal aliens could have been hiding underneath the bales. We reviewed the cases in this Circuit applying the *Brignoni-Ponce* standard and found that the vast majority of cases involved circumstances so clearly suspicious that it is difficult to determine precisely where the reasonable suspicion line has been drawn. *See* cases cited in *Escamilla, supra,* 560 F.2d at 1231–32. We then concluded that the factors relied on by the agents constituted an insufficient basis for a reasonable suspicion that the truck contained illegal aliens. The same is true in the instant case.

## II. Application of the *Brignoni-Ponce* Standard

■ A "vital" element of the *Brignoni-Ponce* test is whether the agents had reason to believe that the vehicle in question had come from the border. *United States v. Escamilla, supra,* 560 F.2d at 1232; *United States v. Woodard,* 531 F.2d 741, 743 (5th Cir. 1976). We have little difficulty with the search of someone who has definitely and positively entered this country from

abroad, but when law enforcement agents interdict those traveling purely within this country, we must be extremely careful to insure that reasonable suspicion does exist, even if the stop is close to the border. As an initial matter, we conclude that the agents did not have reasonable grounds to believe that appellant had come from the border. Appellant was first observed in Hebbronville, some 55 miles from the border town of Zapata. Several small towns are situated between the border and Hebbronville on Highway 16, and Highway 649 intersects Highway 16 between these points. In light of these facts, it was pure speculation to conclude that appellant's journey originated at the border. *See United States v. Escamilla, supra,* 560 F.2d at 1232.

The government also places heavy reliance on appellant's failure to make eye contact with the agents. In *Escamilla* we concluded that "this particular factor cannot weigh in the balance in any way whatsoever" *Id.* at 1233. In this impersonal age, failure to make eye contact with strangers is commonplace; it may be the rule rather than the exception. Reasonable suspicion should not turn on the ophthalmological reactions of the appellant. As we noted in *Escamilla,* characterizing appellant's failure to look at the agents as "suspicious" will place other persons driving near the border in a most precarious position:

> In *United States v. Barnard,* 553 F.2d 389, 391–92 (5th Cir. 1977), the court found it suspicious that the driver of a vehicle "glanced repeatedly and nervously at [a Border Patrol Agent] as he passed." For the court to now hold that the opposition [sic] reaction to the officers' presence is a legitimate consideration in deciding whether to stop a vehicle would put the officers in a classic "heads I win, tails you lose" position. The driver, of course, can only lose.

*Id.* at 1233.

Neither can we give much weight to the allegation that the trunk of appellant's car was riding high. Little familiarity with the laws of physics is required in order to see

the weakness of this factor. Persons hiding in trunks are more like pianos than like blimps; they tend to make a trunk ride low rather than to make it ride high. Yet the border patrol's position seems to be "Riding high or riding low, either way a-searching we will go." The government argues that people who smuggle aliens tend to elevate their trunks in order to disguise the presence of a heavy load. The agents here, according to the government's theory, were merely reacting to a possible deception that might be practiced by a person transporting aliens. The government's argument, however, demonstrates only that we cannot necessarily infer that a trunk is empty merely by observing its elevated position. While we may grant this, it is quite another thing to infer that a trunk is full because it is riding high. Many people view it as fashionable to elevate the rears of their cars, and air shocks are often used to accomplish that purpose. Government agents are entitled to draw no inference of wrongdoing from such activity.

Finally, we view the fact that the car was old, with a large trunk and out-of-county license plates, as having only minor importance. We would have thought it obvious that citizens may leave their state or county without having their purposes questioned. Our concept of the border has become somewhat expansive, but it has not yet attained continental proportions. We are a people on the move, and nary an eyebrow should be raised by seeing a Harris County license plate over 50 miles from our neighbor to the south. It should take more than the elevation of an eyebrow to justify the stop in question here.

### III. Conclusion

Automobiles may not be subjected to arbitrary searches whenever they are near the border. Officers may make a stop only when articulable facts lead them reasonably to suspect that a particular vehicle contains illegal aliens. In this case, no such articulable facts exist, and we conclude from our examination of the totality of circumstances that any suspicion directed at the vehicle was unreasonable. The judgment of conviction is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.