UNITED STATES of America,
Plaintiff-Appellee,

v.

Juan Antonio LAMAS,
Defendant-Appellant.

No. 78–5751.

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1979.

Herbert E. Cooper, Asst. Fed. Public Defender, El Paso, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, HILL, and VANCE, Circuit Judges.

JAMES C. HILL, Circuit Judge.

This appeal is brought by Juan Antonio Lamas who, when stopped by a United States Border Patrol Agent, was found to be transporting four undocumented aliens in his automobile. Following a bench trial, Lamas was found guilty of violating 8 U.S.C.A. § 1324(a)(2) and sentenced accordingly. Without challenging the trial court's conclusion that he violated the law, Lamas appeals, asserting only that the agent who stopped his automobile and discovered the illegal aliens did so in violation of the Fourth Amendment. Our task at this juncture is to decide whether the facts known to the border patrol agent were sufficient to give rise to a reasonable suspicion that illegal activity was afoot.

### I. The Facts.

Shortly after noon on September 29, 1978, United States Border Patrol Agent Rene Garza was stopped in his automobile at the intersection of a farm road and Highway 180 in New Mexico. This point is approximately 190 miles north of El Paso, Texas and the Mexican Border. Garza is an experienced border patrol agent who knew that Highway 180 was a major artery for transporting illegal aliens from Mexico to Colorado and that the surrounding area was not visited frequently by tourists.

As he waited to turn onto Highway 180, Garza spotted appellant's car approaching from the south. The car, a green and white 1966 Ford Galaxy with flashy mirrors, a hood ornament, hub caps, and "fuzzy balls" around the windows, did not, in Garza's opinion, look like the typical tourist's car. It appeared to be heavily loaded and had Colorado license plates. As the car passed, the occupants seemed to avoid eye contact with Garza, and the passengers in the back seat appeared to "slouch down" so as to avoid being seen. His suspicion aroused, Garza followed the car for approximately 3 miles and finally made the stop just north of Cliff, New Mexico. Garza's questioning of the occupants confirmed his suspicion that the four passengers were undocumented aliens.

We have little difficulty in accepting as a fact that Garza honestly believed the car to be carrying illegal aliens. Indeed, the conviction of appellant on four counts of violating 8 U.S.C.A. § 1324(a)(2) is evidence of the absolute correctness of his belief. If the reasonableness of a stop depended on the border patrol agent's subjective beliefs our inquiry would end here. The Fourth Amendment, however, requires us to test this stop in a different manner.

### II. The Legal Standard.

Since the stop in this case was made by a roving border patrol, our decision is controlled by the principles articulated in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). There, the Court held that the Fourth Amendment permits roving border patrols to stop travelers for the limited purpose of questioning them about their citizenship only if the agent is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884,

95 S.Ct. at 2582. The Court went on to list several factors that the agent may consider in determining whether a stop is justified: (1) characteristics of the area in which the vehicle is encountered; (2) unusual patterns of traffic on the particular road; (3) proximity to the border; (4) information about recent illegal crossings in the area; (5) appearance of the vehicle; (6) number and appearance of passengers; (7) behavior of the driver; and (8) behavior of the passengers. *Id.* at 884–85, 95 S.Ct. 2574. No particular factor is controlling; "[e]ach case must turn on the totality of the particular circumstances." *Id.* at 885 n. 10, 95 S.Ct. at 2582. When deciding whether to stop a vehicle, the agent "is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Id.* at 885, 95 S.Ct. at 2582.

### III. *Applying the Standard.*

In a number of recent decisions, this Court has stated that a vital element of the *Brignoni-Ponce* test is whether the agent had "reason to believe that the vehicle had come from the border." *United States v. Ballard,* 600 F.2d 1115, 1119 (5th Cir. 1979); *United States v. Rivera,* 595 F.2d 1095, 1098 n. 4 (5th Cir. 1979); *United States v. Lopez,* 564 F.2d 710, 712 (5th Cir. 1977); *United States v. Escamilla,* 560 F.2d 1229, 1231 (5th Cir. 1977); *United States v. Woodward,* 531 F.2d 741, 743 (5th Cir. 1976); *United States v. Martinez,* 526 F.2d 954, 955 (5th Cir. 1976); *United States v. Del Bosque,* 523 F.2d 1251, 1252 (5th Cir. 1975) (per curiam). We have found this element of the *Brignoni-Ponce* test missing where the stop occurred a substantial distance from the border. *See United States v. Lopez,* 564 F.2d 710, 712 (5th Cir. 1977) (55 miles from border); *United States v. Escamilla,* 560 F.2d 1229, 1230 (5th Cir. 1977) (70 miles from border); *United States v. Martinez,* 526 F.2d 954, 955 (5th Cir. 1976) (50 miles from border); *United States v. Del Bosque,* 523 F.2d 1251, 1252 (5th Cir. 1975) (per curiam) (60 miles from border). Here, appellant's car was first spotted by Garza at a point approximately 190 miles from the border city of El Paso, Texas. Highway 180 runs directly from El Paso to Cliff and is inter-

sected at numerous points by other heavily trafficked highways. Between El Paso and Cliff are several small towns and a few somewhat larger cities. Thus, it is just as likely as not that a car traveling north on Highway 180 in the vicinity of Cliff, New Mexico, regardless of its appearance, might have begun its journey north from a point other than the Mexican border. Although reason to believe that the vehicle had come from the border is a "vital" element, it "is not an essential element if other articulable facts 'reasonably warrant suspicion.'" *United States v. Escamilla,* 560 F.2d 1229, 1232 (5th Cir. 1977). We turn then to the other circumstances that prompted Agent Garza to stop appellant's car.

Garza testified that appellant's car did not look like the typical tourist's car, appeared to be heavily loaded, and had Colorado license plates. These observations were colored by Garza's knowledge that the area was not visited frequently by tourists and that 48% of the cars in which illegal aliens had been found in the area had Colorado plates. Although under such circumstances we might hold that Garza could have reasonably suspected that the car was not carrying "typical tourists," it is too much to ask that we go one step further and conclude that this was enough to arouse a reasonable suspicion that the car was carrying illegal aliens. To hold otherwise would render suspect all citizens of the State of Colorado traveling the roads of New Mexico or Texas in other than late model cars.

Garza also testified that, as the car passed, the passengers in the back seat appeared to slouch down to avoid being seen. While this is certainly a suspicious reaction, on its own it is not sufficient to provide justification for the stop and does not add enough to Garza's other observations to allow us to condone the stop in this case.

The only other point that requires discussion is Garza's testimony that the occupants of the car avoided eye contact with him as they passed. We have stated often that, because of the precarious position travelers

on our nation's highways would be placed in if avoiding eye contact with an officer could be considered a suspicious reaction, "[t]his particular factor cannot weigh in the balance in any way whatsoever." *United States v. Escamilla*, 560 F.2d 1229, 1233 (5th Cir. 1977); *accord, United States v. Lopez*, 564 F.2d 710, 712 (5th Cir. 1977).

### IV. *Conclusion.*

We have before us incriminating evidence obtained by an experienced border patrol agent whose instincts led him unerringly to uncover criminal activity. At the same time, we have before us an officer whose actions violated the United States Constitution. How does a court, unaided by Congress, deal with a situation where it has standing before it two violators of the law? Certainly, the maxim *in pari delicto melior est condito defendantis*[1] does not provide an appropriate solution to such a problem. The answer then? We punish neither. It is not our duty to criticize this arrangement; upon finding this to be the law, we are bound to apply it.[2] To do otherwise would require us judicially to erode the safeguards of the Fourth Amendment in order that Juan Antonio Lamas be punished for the crime there is no doubt he committed.

Since its creation in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), more than 60 years ago, the Exclusionary Rule has been criticized by jurists and commentators alike for what is deemed its inherent flaw: It requires us to set free individuals who have violated our criminal laws.[3] For many this is an unacceptable result. The temptation thus becomes great to round off the edges of the Fourth Amendment to avoid the drastic result which obtains when the Exclusionary Rule is applied. We resist this temptation, however, for our respect for liberty binds us to the Fourth Amendment.

We have here two individuals who have violated the law, one in bad faith, one in good faith. In the present state of the law, the only response from the courts must be to release them both and punish neither. There being no other evidence upon which the conviction could have been based, the charges must be dismissed.

The judgment is REVERSED and the case is REMANDED to the trial court for further proceedings not inconsistent with this opinion.

VANCE, Circuit Judge, dissenting:

If the stop in this case had occurred at some other place and under other conditions, I might well agree with the conclusion of the majority. The facts before us, however, lead me to a different result. Agent Garza was carrying out his duty on Highway 180, well known as the principal conduit used in transportation of illegal aliens from Mexico to Colorado. From January to September 1978, when this stop was made, 216 vehicles carrying 1,175 illegal aliens had been stopped along this conduit. Approximately one-half were destined for Colorado, many in cars bearing Colorado license plates. The location is in a remote, mountainous, ranching area. As Garza waited to turn onto Highway 180 and saw the automobile in question, factors of subtle yet important significance were apparent. The car bore Colorado license plates but did not look like a typical Colorado tourist vehicle. It was old and had flashy ornamentation. It did not have the more cluttered appearance of a tourist car but appeared to be heavily loaded. Five people were in the car and as the car went by it appeared to Garza that they were sliding down in the

---

1. Where the fault is mutual the law will leave the case as it finds it.

2. "The criminal goes free, if he must, but it is the law that sets him free." *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961).

3. "There are several reasons for this failure. The rule does not apply any direct sanction to the individual official whose illegal conduct results in the exclusion of evidence in a criminal trial. With some exceptions law enforcement agencies do not impose direct sanctions on the individual officer responsible for a particular application of the Suppression Doctrine." Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665, 710 (1970).

seat. As a trained officer familiar with the area, he suspected that which was true.

To my mind the test of *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), was clearly met. Several of the specific factors recognized in *Brignoni-Ponce*, numbered 1, 4, 5 and 8 by the majority in the instant case, are present here. Agent Garza developed a reasonable suspicion, sufficient to justify a stop, on the basis of "the characteristics of the area in which [he] encounter[ed] a vehicle," "previous experience with alien traffic" on the route over which a steady stream of illegal aliens flowed, "[a]spects of the vehicle itself [that] justify suspicion," observation of "persons trying to hide," all assessed "in light of [the agent's] experience in detecting illegal entry and smuggling." *Id.* at 884–85, 95 S.Ct. at 2582. The trained officer did not merely see passengers of Mexican extraction, as in *Brignoni-Ponce*, or see a carload of atypical tourists; he noted several articulable circumstances and drew several logical inferences that gave him a suspicion that was reasonable on these facts. The district court found that his suspicions were reasonable and concluded that they justified a brief investigatory stop.

It seems to me important that we keep in mind the nature of the inquiry. We are not dealing with probable cause. The *Brignoni-Ponce* court took from *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the following that serves as a backdrop for the present case:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest . . . simply [to] shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may

be most reasonable in light of the facts known to the officer at the time.

*Id.* at 145–46, 92 S.Ct. at 1923.

The *Brignoni-Ponce* court then held:

> [W]e hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion.

*Id.* at 881, 95 S.Ct. at 2580.

I believe that *Brignoni-Ponce* dictates that the judgment of the district court upholding the stop should be affirmed.