**UNITED STATES of America**

v.

**Charles Richard GARRETT, Herman Tinkle and Jerry O. Nelson.**

**Crim. No. H–80–50.**

United States District Court,
S. D. Texas,
Houston Division.

July 23, 1980.

J. A. "Tony" Canales, U. S. Atty. by Michol O'Connor, Asst. U. S. Atty., Houston, Tex., for plaintiff.

Charles Szekely, Asst. Federal Public Defender, Houston, Tex., for Garrett.

Robert A. Shults, Houston, Tex., for Tinkle.

Robert S. Bennett, Houston, Tex., for Nelson.

## MEMORANDUM AND ORDER

CIRE, District Judge.

Currently before the Court are the various defendants' motions to suppress evidence. Defendants claim that the evidence was obtained pursuant to an illegal arrest and hence is excludable as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Defendants are all charged with conspiring to obstruct justice, 18 U.S.C. § 371, § 1510, and with possession of a firearm during the commission of a felony, 18 U.S.C. § 924(c). Defendant Garrett is charged with violating 18 U.S.C. § 922(h)(1) and § 924(a), which prohibit a felon from receiving a firearm from interstate commerce. Defendant Nelson is charged with violating 18 U.S.C. § 1202(a)(1), which prohibits a felon from possessing a firearm affecting interstate commerce. A hearing on the motion to suppress was conducted on June 11, 1980, wherein a description of the events surrounding the taking of the evidence in question was adduced.

Agent Randy Cunningham of the Treasury Bureau's Alcohol, Tobacco and Firearms Division testified that in March, 1980, he was working on a surveillance unit which was keeping an informal watch over one Peter Kalfas. The surveillance was not continuous or around the clock, but consisted of checking in with Kalfas several times in a twenty-four hour period. Kalfas was scheduled to testify in the upcoming arson trial of Raymond Conti, an underworld figure, and was key witness in an ongoing Federal investigation.

According to Agent Cunningham, Conti and another investigatory target, Roland Savant, had told Cunningham in 1979 that there was a contract out on the life of Kalfas. Cunningham believed this to be true because of Kalfas' role as a government witness. Additionally, agents had from time to time observed cars parked in front of Kalfas' home, and knew that a girlfriend of Conti's, known to Kalfas, had "checked up" on the witness by patronizing Kalfas' beauty shop.

On March 13, 1980, Cunningham and another ATF agent went to Poppolo Village shopping center to check on Kalfas at his place of business. At the shopping center Kalfas pointed out a blue Dodge some distance away and said he thought that car had passed him earlier in the day, and that a passenger had crouched down and covered his face when they went by. Agent Cunningham saw two white males in the blue Dodge, but was not close enough to identify them, and did not seek any further identification of the automobile. Cunningham observed one of the men leave the car and walk toward a restaurant where he was briefly out of sight. The man then returned to the blue Dodge where he appeared to be watching Kalfas, who had walked from the sidewalk in front of his shop to his car in the parking lot and back to the sidewalk.

Agent Cunningham devised a plan to test whether the occupants of the Dodge were going to make an attempt on Kalfas' life.

Kalfas was instructed to drive to a small subdivision some 18 miles away; Cunningham radioed two other agents to position themselves inside the main entrance to the subdivision and directed them to arrest the occupants of the car if it entered the subdivision. Cunningham then drove toward the parking lot exit, and although he passed fairly close to defendants' car he avoided looking directly at them, fearing that to do so would alert them to the agents' presence. Cunningham left the parking lot followed by Kalfas, and behind Kalfas was the second agent. The blue Dodge pulled out after the second agent.

This procession of automobiles wound through rush hour traffic toward Interstate 45, where they all proceeded north. During the 18 mile trip to Shenandoah Valley subdivision, the blue Dodge occasionally pulled in and out of the flow of traffic as though the occupants were attempting to keep Kalfas in sight; the lead cars from time to time slowed down to permit defendants to catch up.

Some 30 to 45 minutes after leaving the shopping center, Kalfas exited I–45 and entered Shenandoah Valley. Agent Cunningham continued straight ahead on the access road rather than preceding Kalfas into the subdivision; the second agent continued straight also. As Kalfas passed a convenience store near the entrance to the subdivision, Agent Taylor pulled out of its parking lot behind him. Agents Allen and Taylor had been positioned there pursuant to Cunningham's earlier radio instructions. The blue Dodge then entered the subdivision and came to a stop behind the agent's car at a stop sign. Kalfas' car proceeded straight ahead, as did Taylor, but the blue Dodge turned right, followed by Agent Allen. It is unclear whether the occupants of the blue Dodge saw Kalfas' car going straight ahead, but from Taylor's testimony it appears that they could easily have seen it.

The blue Dodge, followed by Agent Allen, proceeded at a very slow rate of speed until Taylor, approaching from the opposite direction, determined that the street was a safe spot to effect the arrest ordered by Agent Cunningham. Upon seeing Taylor use his radio, the driver of the blue Dodge put the car in reverse but was blocked from behind by Agent Allen. The two agents then arrested the occupants of the car by drawing weapons and shouting that they were under arrest. No weapons were seen prior to the arrest but were found by Agent Taylor when he approached the Dodge and ordered the passenger, Garrett, to get out.

Taylor found a 12–gauge shotgun between the seat and door on the passenger side, and a .38 caliber pistol partially under the passenger seat. Ammunition for the shotgun was also discovered. Defendant Tinkle made a statement at the scene of the arrest, another that night, and yet another on March 18, 1980. Defendant Garrett also made a statement on March 18. Defendant Nelson was implicated by Tinkle's statement and by a photo identification made by Tinkle while in custody.

The evidence here is best analyzed separately: first, the physical evidence seized when Garrett and Tinkle were arrested; second, the statement made by Tinkle at the scene of the arrest; third, the statement signed by Tinkle later that night; and fourth, the statements of Tinkle and Garrett taken several days later. Additionally, defendant Nelson's motion concerning a photographic display is considered. This division is useful since there are different concerns generated by physical and verbal evidence, and since admissibility may hinge on the relationship between the evidence obtained and the challenged conduct.

*Guns and Ammunition; Probable Cause*

■ In order to admit the guns and ammunition, the government must establish that it was obtained pursuant to a valid arrest, since a search made pursuant to a valid arrest does not ordinarily require a search warrant. The arrest is valid if an arrest warrant supported by probable cause is obtained, or if the arresting officers had the requisite probable cause but under the circumstances needed to proceed without a warrant. In order to support and encour-

age the warrant requirement, an officer who proceeds without a warrant must at the very least have evidence of probable cause sufficient to obtain one. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). His evidence of probable cause must not be less judicially competent or persuasive than that offered to a neutral magistrate. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

■ Probable cause consists of those facts and circumstances within the officer's knowledge, of which he had reasonably trustworthy information, which justify his belief that an offense is being or has been committed. *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The officer's subjective belief or suspicion or conclusion that there is cause is not enough; he must have facts upon which the belief is based. *Nathanson v. United States,* 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). Probable cause may arise from an informant's tip, *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), but there must be some substantial basis for believing it. Otherwise the factual basis requirement of *Nathanson* is circumvented merely because the belief or suspicion or conclusion is that of a third party rather than that of the officer.

■ When asked at the suppression hearing what prompted his decision to arrest the occupants of the Dodge, a decision which was made some 30–45 minutes earlier subject only to the Dodge entering Shenandoah Valley, Agent Cunningham replied that it was clear in his mind what the defendants were up to. Additionally, he stated that he was fearful of losing control of the situation once everyone was in the subdivision, which has only one major and one little-known entrance road. While on its face this testimony supplies no basis for probable cause, we can infer from his other testimony what facts led to his conclusion. An analysis of those facts indicates that they fall short of providing probable cause for the arrest of Garrett and Tinkle.

Agent Cunningham relied heavily on the "tip" received from Raymond Conti. Cunningham admitted that Conti had never before been a government informer, and in fact was generally an unreliable person, but Cunningham credited the tip because of what he perceived as Conti's self-serving motive: he believed that Conti may have himself been behind such a contract on Kalfas and was telling Cunningham in an attempt to discredit this likely conclusion should the contract be performed. Cunningham had similar information from Roland Savant, another underworld figure who suggested that there were several people interested in killing Peter Kalfas. Nothing was disclosed at the suppression hearing to indicate that either informant supplied any specific information concerning who precisely was hiring, who had been hired, or when and how an attempt might be made. Specifically, no mention was ever made of Garrett or Tinkle, nor of the blue Dodge.

■ The traditional test applied to an informant's tip is whether there are underlying circumstances of reliability which justify believing the informant, and whether the informant's belief is supported by a factual basis. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Reliability is frequently established by the informant's prior relationship with law enforcement officials, *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), but may be demonstrated by an admission against interest, *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). The factual basis for the informant's tip may be his personal contacts with the defendant, *Id.,* or he may identify and establish the reliability of *his* sources, *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), or his tip may be corroborated by facts then or subsequently known to the officer. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Corroboration must be by something other than innocent-seeming activity, *Spinelli v. United States,* 393 U.S.

410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The factual basis may be satisfied by a plethora of details concerning the defendant's criminal activity so that the officer is certain he is not acting merely on an underground rumor or an individual's general reputation. *Id.*

■ Conti's tip seems to be the type of rumor against which *Spinelli* cautioned. Absent any prior work as an informant, Conti's reliability rests solely on the circumstances which suggest that he himself was involved in the contract. But Conti's tip did not amount to an admission against interest under *Harris, supra,* since he did not provide information based on personal experience which would subject him to prosecution. Nor was the information given for any purpose suggesting its reliability; it was not offered to prevent a crime from occurring, to lead to a criminal's apprehension, or in exchange for favored treatment by his prosecutors. Rather, it appears to have been given in hopes of misleading law enforcement agents in the event the plot was successful; these circumstances detract from, rather than enhance, Conti's reliability.

The absence of a factual basis or any details of the scheme raises additional problems with respect to Conti's tip. *Aguilar* requires that the informant make clear to the officer what facts led him to the conclusion that a defendant had committed or was committing a crime, just as the officer himself would have to articulate such facts to a magistrate to obtain a warrant. Such facts are absent here, although it is unclear whether they are nonexistent or merely obscured by the numerous confidential investigations peripheral to this case.

Even assuming that Conti gave good information based on his own knowledge or facts related to him by reliable sources, the tip was nevertheless so vague and imprecise as to set no bounds for an officer acting on it. In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), an informant gave to officers seeking drug dealers the name "Blackie Toy," the owner of a laundry on Leavenworth Street. The

agents arrested James Wah Toy, who answered the door of a laundry on Leavenworth which displayed the sign "Oye's Laundry." The Court found the tip inadequate to provide probable cause since it failed to lead them directly to a particular suspect.

> Not the slightest intimation appears on the record, or was made on oral argument, to suggest that the agents had information giving them reason to equate "Blackie Toy" and James Wah Toy—e. g., that they had the criminal record of a Toy, or that they had consulted some other kind of official record . . . which had narrowed the scope of their search to this particular Toy.

*Id.,* 371 U.S. at 482, 83 S.Ct. at 414. The Court condemned the "unchecked discretion" which arises from vague information and untested sources. See also *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 2251 at n.1, 60 L.Ed.2d 824 (1979).

The tip supplied by Conti is not even as precise as that offered in *Wong Sun.* Here there were no named suspects, no descriptions, no time or date, no location; in short, there was nothing on which officers could have acted at the time the tip was received. The court recognizes that such information properly served to heighten the agents' suspicions and sharpen their observations; their duty to protect Kalfas demanded an alert and cautious surveillance. The tip did not, however, give them *carte blanche* to arrest anyone who conceivably came within its wide spectrum. The Court concludes that the information fails to meet any standard of reliability, factuality, or precision required of informants' tips and hence fails to supply probable cause for this arrest. See *United States v. Jones,* 619 F.2d 494 (5th Cir. 1980).

It remains to determine, with the tip providing only a suspicious background rather than a fact contributing to probable cause, whether probable cause can be found as a result of any other facts and circumstances within Cunningham's knowledge. These consist of Kalfas' belief that the passenger in the car had hidden his face while

passing him earlier, and the fact that the car had followed Kalfas from the shopping center to Shenandoah Valley.

■ The encounter with Kalfas does not signal any criminal activity; slouching down to avoid eye contact with an officer is insufficient to justify even a stop. *United States v. Lamas,* 608 F.2d 547 (5th Cir. 1979). Such conduct may be suspicious, *Id.,* especially here where the government witness and the agents assigned to protect him are understandably alerted by the circumstances. But suspicious circumstances are not transformed into probable cause by such innocuous conduct. *United States v. Butler,* 611 F.2d 1066 (5th Cir. 1980).

We may safely infer, for purposes of this discussion, that defendants Garrett and Tinkle were indeed following the government witness. What we cannot infer, and what Agent Cunningham could not infer, is that their conduct was criminal. He may have, and obviously did, believe it criminal, but his subjective belief is not enough. There was no identification of the occupants of the car or the car itself to determine if they were known criminals or connected in any way with Conti. No weapons were seen prior to the arrest. There was nothing to tie these particular suspects to the vague tip provided by Conti. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Despite Cunningham's understandable concern, there was nothing to indicate that this "surveillance" by the occupants of the blue Dodge was leading to an attempt on Kalfas' life and was distinguishable from prior surveillance by known associates of Conti. There was no sign that Kalfas' life was endangered; he stood in front of his beauty shop, walked to his car, drove past the Dodge as he left the shopping center, and was separated from the Dodge when he went straight and they turned right once inside the subdivision.

■ The agents' decision to arrest Garrett and Tinkle must also be analyzed in light of the investigatory stop permitted by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such a stop is permitted when an officer does not have sufficient facts available to constitute probable cause, but nevertheless has a reasonable suspicion that the suspect is up to some criminal activity. He may detain a suspect for 15–20 minutes to get more information which may deny his suspicion or may provide him with probable cause to arrest. He may conduct a pat-down for weapons if he has reasonable grounds to suspect that he is in danger; such pat-downs often yield probable cause. The investigatory stop is considered appropriate and reasonable conduct by officers who are checking out a tip but do not have probable cause. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). It seems clear that the agents here would have been justified in stopping to investigate a car which they suspected of following Kalfas for 18 miles, but it is also clear that they exceeded a *Terry* stop and, instead, effected a complete arrest. In their zeal they exceeded the limits imposed on an arresting officer by the Fourth Amendment. The Court concludes that Garrett and Tinkle were arrested without probable cause.

■ Since the arrest was invalid, the search conducted pursuant thereto was invalid, with the result that the evidence seized after the arrest may not be used in trial against defendants Garrett and Tinkle. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). This evidence includes the guns and ammunition recovered from the blue Dodge, and accordingly the motions to suppress are to this extent GRANTED as to Garrett and Tinkle. Since defendant Nelson was not in the car and has asserted no expectation of privacy therein, his motion to suppress this evidence is DENIED for lack of standing. *United States v. Salvucci,* —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

### Tinkle's Statement at Scene

■ The exclusionary rule applies with equal force to verbal evidence which constitutes fruit of the illegal arrest. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). If the taint

of the illegality is not sufficiently cured by attenuation, a statement taken following an improper arrest may be deemed to be an unreasonable "seizure" even if it is made voluntarily. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

From the facts adduced at the hearing, it appears that Tinkle's first statement followed so closely upon the heels of the illegal conduct that it must be considered an excludable "fruit." Following the arrest, the suspects were immediately handcuffed, and other agents converged on the scene. While Cunningham testified that Tinkle volunteered the statement, there are no circumstances suggesting that this was an act of free will, attenuated from the arrest, as contemplated by *Brown, supra.*

The Court concludes that Tinkle's first statement, given verbally at the scene of the arrest, may not be used in trial against him, and that portion of Tinkle's motion to suppress is accordingly GRANTED. Defendants Garrett and Nelson have no standing to challenge the admissibility of Tinkle's statement on Fourth Amendment grounds. Co-defendants are protected against the improper use of post-arrest statements for different reasons. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### Tinkle's Statement that Night

Defendant Tinkle, after an appearance before a magistrate, made a statement late that same night which was reduced to writing by two different agents. Ex. 5 and 5a. Cunningham testified that the statement was virtually the same as that given at the scene of the arrest. There is no question concerning the proper administration of *Miranda* warnings, which inform a detainee of his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel; these warnings are thus directed at satisfying the requirement that statements must be voluntary. But *Miranda* warnings do not cure Fourth Amendment defects, since they do not inform a defendant that he is entitled to be free from illegal detention. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

Not all subsequent statements are incurably tainted by the illegal arrest. If the causal relationship between the arrest and the statement is attenuated, the statement is admissible assuming that the 'voluntariness' threshold has been met, as it has here. *Brown* advises that attenuation may be determined by examining several factors: 1) whether *Miranda* warnings were given, 2) the temporal proximity between the Constitutional violation and the statement, 3) any intervening circumstances, and 4) the purpose and flagrancy of the official misconduct.

Proper *Miranda* warnings were given on several occasions after Tinkle's arrest, including those given by a magistrate. However, the appearance before a Federal magistrate, at which time charges were filed against him, was not until the next day; the statement was taken and reduced to writing at 12:28 a. m. on March 14 following the 6:00 p. m. March 13 arrest. Although the time here is much longer than that sanctioned in *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), that case involved a relaxed and congenial detention distinguished from the "strictest of custodial conditions" which we have here. Moreover, Tinkle's statement was essentially the same as that given at the scene rather than one prompted by any intervening circumstances. As such it is the fruit of the first, and inadmissible. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Consideration of the officer's conduct need not be reached.

### Later Statements by Garrett and Tinkle

Defendant Garrett gave a statement to Agent Cunningham on March 18, 1980, some five days after the arrest and four days after his appearance before a Federal magistrate. In determining its admissibili-

ty, the Court looks first to the voluntariness requirement and then to the factors outlined in *Brown*.

There is no indication that the statement was not voluntary. Proper *Miranda* warnings were given and there is nothing to suggest that Garrett did not properly waive his right to remain silent and his right to counsel. Although there was some testimony that Agent Taylor may have cut short Garrett's first phone call to counsel, the record indicates that he was represented at his initial appearance.

■ Although *Miranda* does not cure a Fourth Amendment defect, the warnings are a factor which *Brown* considered important and they were properly given here. The five days between arrest and statement also suggest that the illegal taint was attenuated. Intervening circumstances include his initial appearance before the U.S. magistrate and contact with his sister while in the detention center. Agent Cunningham testified that the sister, or someone purporting to be his sister, had asked to see the defendant and wanted to encourage him to cooperate. While perhaps the official conduct exceeded the Fourth Amendment limitations, it was motivated by a heightened suspicion understandable in light of the circumstances. The misconduct was not purposefully investigatory, *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and hence does not rise to the level of conscious misconduct requiring exclusion of this statement. *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Defendant Garrett's motion to suppress same is accordingly DENIED.

A similar analysis yields the same result concerning defendant Tinkle's statement of March 18, 1980. Tinkle had by then had an appearance before a Federal magistrate with counsel and was presumably not responding to the sudden and dramatic events which presumably precipitated his first statements. This later statement was not a product of the illegal arrest and is admissible. Defendant Tinkle's motion to suppress this statement is accordingly DENIED.

*Photo Identification of Nelson*

■ Defendant Nelson moves to suppress the results of a photographic display shown to Tinkle on March 18, 1980. This photo identification occurred prior to any "critical stage" in the proceedings against Nelson; at that time, Nelson had no Sixth Amendment right to counsel, *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), nor was this display fundamentally unfair, requiring its exclusion. And since Nelson has no standing to challenge any violation of Tinkle's rights, the motion is accordingly DENIED.