UNITED STATES of America, Plaintiff,

v.

Nicholas GONZALEZ–VARGAS, Defendant.

Crim. No. 80–124A.

United States District Court, N. D. Georgia, Atlanta Division.

Sept. 29, 1980.

William Toliver, Asst. U. S. Atty., Atlanta, Ga., for plaintiff.

Jocelyn Fleming and Jay L. Strongwater, Federal Defender Program, Inc., Atlanta, Ga., for defendant.

## ORDER

ROBERT H. HALL, District Judge.

After having carefully reviewed the Magistrate's Report and Recommendation in this case, the court receives it with approval and adopts it as the opinion and order of the court with the exception of that portion of the report and recommendation dealing with defendant's motion to suppress.

Defendant, Nicholas Gonzalez–Vargas, is charged with knowingly transporting six aliens who were not duly admitted or legally entitled to reside in this country and thereby violating 8 U.S.C. § 1324(a)(2). Defendant has moved to suppress all evidence obtained as the result of a stop of defendant by two agents of the Immigration and Naturalization Service (INS) on April 21, 1980. Defendant contends that the stop on April 21 was not founded upon reasonable suspicion and is therefore in violation of the fourth amendment to the Constitution of the United States.

On the morning of April 21, 1980, defendant was driving north in a 1974 Dodge Coronet station wagon with North Carolina license plates along a section of interstate highway in Atlanta, Georgia, known as the downtown connector. The downtown connector is a heavily traveled road formed by the merger of I–75 and I–85 as those highways pass through downtown Atlanta. Defendant carried six passengers in the station wagon, one in the front seat, three in the middle seat, and two in a rear seat facing the rear window in the very back of the station wagon. All six passengers and the driver appeared to be of Hispanic origin, and in fact, all six passengers were in the United States illegally.

On the same morning two INS officers, Larry Fort and Craig Barlow, were also traveling north on the downtown connector on their way to investigate an unrelated case in Tucker, Georgia. The agents were riding in a solid green 1976 Plymouth Fury with plain features and a police radio antenna that is approximately two feet long and is attached to the left rear fender of the Fury. Though unmarked, the car arguably looked like a law enforcement vehicle. Neither agent was uniformed.

Agent Fort has over ten years of experience with the INS and has formerly been stationed in Texas and Arizona. At the hearing before the United States Magistrate, Fort testified that he has handled a large number of smuggling cases and several hundred cases involving the transportation of aliens illegally in the United States. As Agents Fort and Barlow traveled north on the downtown connector, they spotted defendant's Dodge station wagon. Agent Fort observed all of the characteristics of the station wagon and its occupants described above. After passing defendant's car, Fort instructed his partner to slow down in order to observe the defendant and his passengers more closely.

Upon closer observation, agent Fort noted a Turista sticker, a permit which allows a vehicle to travel more than 25 miles into the interior of Mexico, on the windshield of the defendant's car. Several minutes later, defendant passed the INS vehicle, and Fort noticed that three of the six passengers had disappeared. After overtaking and passing the INS agents, defendant pulled in front of the INS car and slowed down to a speed uncharacteristic of the traffic on the highway that day.

After several more minutes of observation, during which none of the passengers reappeared, the agents sounded their siren

and instructed defendant to pull over. After approaching the car, Agent Barlow went to the driver's side and identified himself as an immigration officer to defendant while Fort likewise identified himself on the passenger's side of the station wagon. The passengers, in response to a question from Fort, revealed that they were from Mexico and had entered the country by "wading the river." Transcript of Hearing before Magistrate at 19. Defendant was arrested and charged with violating 8 U.S.C. § 1324(a)(2).

Agent Fort testified before the Magistrate that prior to April 21, he had been aware of illegal alien traffic on Atlanta's interstate highways. Furthermore, he knew of a pending prosecution involving 20 people smuggled into North Carolina, and he was aware of Atlanta's significant Hispanic population.

■ Based on the totality of the circumstances revealed by these facts, the government argues that Agent Fort's stop of defendant was based on a reasonable suspicion that illegal aliens were present in the station wagon and therefore did not violate the fourth amendment. Upon careful analysis of the law in this circuit, the court cannot agree.

■ The Supreme Court of the United States set forth a test for assessing the constitutionality of a stop made to inquire about citizenship in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In *Brignoni–Ponce* the Court affirmed the applicability of the fourth amendment to a brief detention short of traditional arrest when effected to inquire about an individual's citizenship. The intrusion occasioned by this detention, which in this case is minimal, must be weighed against the public interest involved, which in this case is great. The Constitution does not always require a standard as strict as probable cause to justify some degree of police intrusion. "In this case as well, because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for polic-

ing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *Id.* at 881, 95 S.Ct. at 2580. In order to conduct a stop and ask questions about citizenship and immigration status, then, the fourth amendment requires that the agents in this case must have been "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2582 (footnote omitted).

Though the relevant inquiry is fact–specific and turns on the totality of the circumstances, the Court delineated eight general factors which may be taken into account: (1) the characteristics of the area in which the vehicle is encountered; (2) unusual patterns of traffic on the particular road; (3) proximity to the border; (4) information about recent illegal crossings in the area; (5) appearance of the vehicle; (6) number of passengers; (7) behavior of the driver; and (8) behavior of the passengers. *Id.* at 884–85, 95 S.Ct. at 2582.

Were the court only to be concerned with *Brignoni–Ponce*, it is possible that the stop could be upheld and the motion to suppress denied. The stop held illegal in *Brignoni–Ponce* was made based on the single fact that the occupants of the car were of Mexican ancestry. *Id.* at 885–86, 95 S.Ct. at 2582. While the stop in *Brignoni–Ponce* was patently pernicious, the stop in the present case was supported by several facts in addition to the Hispanic appearance of defendant and his six passengers. It is possible, though by no means clear, that Atlanta highways are major routes for the transportation of unauthorized aliens. There is also some evidence in the record that defendant may have been driving in a manner uncharacteristic of the downtown connector. Station wagons seem to be commonly used for the transportation of aliens illegally in the country and the large num-

ber of passengers in the car is characteristic of alien smuggling. The attempt of some of the passengers to hide certainly suggests some illegal activity and strengthens any inference to be drawn from the fact that all of the occupants appeared to be Hispanic. Defendant, of course, at the time of the stop was at least 1,000 miles from the border, but the Turista sticker on the car's windshield may have compensated for the magnitude of this distance.

The facts in defendant's case cannot be analyzed as if *Brignoni–Ponce* were the only pertinent authority, however. The Court of Appeals for the Fifth Circuit has dealt extensively with similar motions made in cases involving the transportation of illegal aliens. It is now well–established that in the Fifth Circuit the vital element of the *Brignoni–Ponce* test is whether the agent had reason to believe the vehicle in question had come from the border. *United States v. Lopez,* 564 F.2d 710, 712 (5th Cir. 1977). "We have little difficulty with the search of someone who has definitely and positively entered the country from abroad, but when law enforcement agents interdict those traveling purely within this country, we must be extremely careful to insure that reasonable suspicion does exist, even if the stop is close to the border." *Id.*

The circuit court has suggested, then, that the further away from the border that a stop occurs, the more that is required for the totality of the circumstances to justify the stop within the protection of the fourth amendment. A requirement that a greater quantum of evidence should be required to justify a stop and citizenship inquiry the further away from the border or its functional equivalent that such a stop occurs is an appropriate response, in light of the fourth amendment, to the problem of the inland movement of those who are not duly admitted to the country. The likelihood that any particular car has come from the border, all else being equal, is inversely proportional to the greatness of the distance from the border. The likelihood that a car has come from the border is lessened with each town along the way and each highway intersecting the route between the

border and the location of the stop. If an INS agent must have a reasonable suspicion under *Brignoni–Ponce* to make a stop and citizenship inquiry, logic requires more before suspicion can be reasonable further from the border than is required actually at the border. While at the border it is reasonable to suspect that *every* car has come from outside the boundaries of the United States, since the stop of defendant occurred 1,000 miles from the Mexican border, the other circumstances justifying the stop in question must be more weighty than circumstances that would justify a stop closer to the border.

Many of the individual facts in this case are logically probative, at least to some degree, of the conclusion that illegal aliens were present in defendant's car despite the distance from the border at the time of the search, but no single fact is determinative. "Each case must turn on the totality of the particular circumstances." *Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582. When the present facts are compared to the totality of the circumstances in recent Fifth Circuit decisions, precedent requires that defendant's motion be granted.

In *United States v. Lamas,* 608 F.2d 547 (5th Cir. 1979), the court dealt with a violation of the same statute that defendant is charged with violating. The facts of *Lamas* involved a stop conducted by an experienced border patrol agent along a major artery for illegal alien transportation 190 miles north of the Mexican border in an area not commonly frequented by tourists. Lamas' car, a green and white 1966 Ford Galaxy with flashy mirrors, a hood ornament, and fringe around the windows approached from the south and appeared to be heavily loaded. In addition, the car had Colorado license plates, a common practice for alien smugglers. All of the passengers appeared to be of Mexican origin and while some simply avoided eye contact with the agent, others slouched down to avoid being seen. The Fifth Circuit panel in *Lamas* especially noted that within the 190 miles between the border and the location of the stop, the highway on which defendant was

traveling is intersected by many other highways and is dotted with small and medium-sized towns.

In applying the *Brignoni–Ponce* analysis to the case before it, the *Lamas* court found that the element of proximity to the border was lacking. Due to the distance to the border, the intersecting highways, and the towns located along the subject highway, the court determined that it was as likely as not that the defendant's journey began at a point other than the Mexican border. Therefore, the vital element of having reason to believe that the vehicle in question had come from the border was missing. The Fifth Circuit gave no weight to the fact that some of the passengers avoided eye contact with the agent and determined that slouching down, though suspicious, was insufficient to justify a stop 190 miles from the border.

The totality of the circumstances in the case of defendant seems even less strong than that disapproved by the Fifth Circuit in *Lamas*. The distance from the border is almost five times as great, and the highway on which defendant was stopped serves as a funnel for three major interstate highways in the Atlanta area. Furthermore, between Atlanta's downtown connector and the Mexican border lie junctions with several other interstate highways and an almost infinite number of lesser federal and state highways. Hundreds of towns lie along even the most direct route between Atlanta and Mexico, as well as do several major cities. In addition, defendant's car did look like a typical tourist's car unlike the car in *Lamas*. There are, of course, factual similarities between the two cases, but the totality of the circumstances in *Lamas* yields a stronger inference of the transportation of illegal aliens than does the totality of the circumstances in the present case. Surely if the district court's denial of the motion to suppress in *Lamas* resulted in a reversal, as it did, defendant's motion should be granted in the present case.

Another recent Fifth Circuit case, *United States v. Pacheco*, 617 F.2d 84 (5th Cir. 1980), emphasizes the importance that the circuit court attaches to the fact that other highways intersect the one on which a stop is made. *Pacheco* dealt with a stop made 85 miles from the border on a known route for the transportation of illegal aliens. The route involved was an interstate highway intersected by many other highways and populated by many small towns. This fact was regarded as being crucial by the unanimous court, which reasoned that any inference that the car involved had come from the Mexican border was "pure speculation." *Id.* at 86. Surely, Officer Fort's suspicion that defendant's car had come from the Mexican border, despite the Turista sticker, is entitled to no more weight than the speculation involved in *Pacheco*.

"The absence of a reason to believe the vehicle had come from the border, however, is not alone dispositive." *Id.* In *Pacheco*, the car that was stopped drove low to the ground and was heavily loaded, the highway involved was an artery for illegal alien transportation, and some of the passengers attempted to hide from the border patrol agent. Nevertheless, these facts did not yield circumstances sufficient to justify a stop under the fourth amendment when the vital element of reason to suspect that the car had come from the border was missing.

The sum of the facts in the present case is weaker than the sum of the facts involved in *Pacheco* and *Lamas*. If the stop of defendant is upheld, the sole distinguishing fact must be the presence of the Turista sticker. The sticker certainly does indicate that at some time defendant's car had likely been more than 25 miles inside Mexico. The Turista sticker, however, does not overcome the improbability that defendant's journey in the United States originated at the border given the distance from the border that this stop occurred and the almost infinite number of alternative points of origin between the Mexican border and Atlanta.

Of course, Agent Fort's suspicion proved correct. Defendant was indeed transporting aliens not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States. Based

on the evidence obtained from the stop of defendant by Agents Fort and Barlow, the government's case that defendant has violated 8 U.S.C. § 1324(a)(2) appears strong. This state of affairs, however, seems to be the price of protecting our fourth amendment rights with an exclusionary rule. "It is not our duty to criticize this arrangement; upon finding this to be the law, we are bound to apply it." *Lamas*, 608 F.2d at 550 (footnote omitted). The vitality of the exclusionary rule rests solely with the Supreme Court of the United States, the court which created it, and not with "such inferior [circuit and district] courts as the Congress may from time to time ordain and establish." U.S.Const. art. III, § 1.

The defendant's motion to suppress must be GRANTED.