UNITED STATES of America

v.

Jose David LEIJA, Santiago Margil Cortez.

Crim. No. 4–89–15–E.

United States District Court, N.D. Texas, Fort Worth Division.

April 26, 1990.

---

Randell P. Means, Asst. U.S. Atty., Fort Worth, Tex., for plaintiff.

Moises V. Vela, Harlingen, Tex., for defendants.

---

## ORDER

MAHON, District Judge.

On January 11, 1990, the Court heard evidence on the motion to suppress of defendants Jose David Leija and Santiago Margil Cortez. After a lengthy hearing, the Court makes the following determination.

## FACTUAL FINDINGS

The facts are basically undisputed.

On January 7, 1989, Border Patrol Agent Steven C. Hunt and Fort Worth Police Officer Robert Rangel were conducting traffic observation duties on Interstate 20 near the city of Weatherford, Texas. As border patrol agent, Hunt's chief duties were to detect and apprehend illegal entrant aliens and the smugglers of illegal entrant aliens. Officer Rangel was assigned to Hunt as a Fort Worth Police Department liaison.

On January 7, 1989, Agent Hunt's marked border patrol vehicle[1] was positioned facing westward on Interstate 20 observing the east bound traffic. At approximately 10:30 a.m., both officers Hunt and Rangel observed a large white late model Oldsmobile sedan approaching from the west travelling eastward. From their view, both officers observed that the white sedan contained at least three occupants, two in the front and one in the rear. Agent Hunt testified that the three occupants in the white sedan were engaged in some sort of animation as they were approaching the direction of Hunt and Rangel. Agent Hunt, however, testified that the animation came to a halt once the white sedan quickly approached. Agent Hunt testified that the occupants became like "robots." Ultimately, as the white sedan passed by the officers, neither of the three occupants of the white sedan were engaged in anything other than looking forward as if looking toward the interstate pavement.

At this point it becomes necessary to expound on the testimony concerning Hunt's experience as a border patrol agent. During the hearing, approximately one and a half hours was devoted to Hunt's background and qualifications as a border patrol agent. Hunt has had some twelve years experience as a border patrol agent. Although presently stationed in the Dallas office in Euless, Texas, Hunt worked as a border patrol agent in San Diego, California from October 1977–April 1988. It is uncontroverted that Hunt has had vast experience with the border patrol as a result of his long stint working the Mexican border and surrounding areas in San Diego.

As a result of his experience, Agent Hunt testified that one of the factors he weighs in stopping vehicles is the type of vehicle being driven. Hunt looks for inconspicuous, large vehicles that have the potential for concealing great amounts of weight. The large vehicle is important to alien smuggling primarily due to the spacious trunk capacities possible through creative packing. The next factor considered by Hunt is the race or alienage of the vehicle's occupants. The race of the occupants is significant because a large number of aliens in Texas are of Hispanic origin due to the close proximity of Mexico and Central America. From his experience, Hunt knows that race plays a big part of organized alien smuggling because of the need for communication and contacts within Mexico. Hunt and Rangel observed that all of the occupants appeared to be from Hispanic origin.

Finally, Hunt testified that he knew from his experience that Interstates 20 and 35 are significant routes for alien smuggling. Hunt noted that Dallas is the "funnel point" for alien smuggling that leads to the Northeast.

Combining all of the factors hereinabove mentioned, Hunt and Rangel decided to follow the vehicle for further observation. Agent Hunt turned the border patrol vehicle around and proceeded to catch up to

---

1. The border patrol car was equipped with emergency lights and sirens mounted on the exterior of the vehicle. In addition, the border patrol emblem was affixed to the vehicle. Additionally, Agent Hunt was dressed in his official border patrol uniform while Officer Rangel wore his police officer's "raid" jacket clearly signifying the word "Police." In other words, the officers were not undercover.

the defendants' vehicle. The officers testified that the white sedan was apparently laden down with something heavy in the rear of the car. This enhanced the interest of Agent Hunt even more because from his experience as a border patrol officer, Hunt knew that aliens were typically stored or hidden away in the trunk area which would ultimately cause the vehicle's rear end to be laden down.

Hunt testified about the differences between "low rider" cars that have been modified and cars that are laden down by excess weight in the trunk. Hunt explained that in the case of a "low rider," the leaf and coil springs are removed so as to set the whole body of the car lower to the ground. The "low riders" are different to the eye of the officer because the "low rider" sits level with the ground.

As the border patrol followed, Agent Hunt decided to position his vehicle beside the white sedan. Officer Rangel positioned himself so that he was facing toward the passenger window in full view of the white sedan. Rangel explained that he wished to observe the occupants and their reaction to the border patrol car. Rangel observed that there was no talking, and no moving of heads. The occupants were upright and facing toward the front of the car. Rangel noticed that all the occupants appeared to be rigid and neither of them looked toward the border patrol car at any time. Hunt testified that, in his experience, aliens or alien smugglers typically maintain what is referred to as the "ostrich syndrome." Hunt explained that the "ostrich syndrome," albeit subjective, was, in the mind of an alien, "If I don't see them, they won't see me."

At this point, the officers made their decision to pull back behind the white sedan and turn on the emergency lights. The white sedan immediately pulled over, and the driver (Leija) of the vehicle quickly exited. Agent Hunt testified that the driver appeared to be hyper, immediately proclaiming his U.S. citizenship by pulling out his drivers license without being asked. Hunt observed Leija to be nervous in his speech, avoiding eye contact, and shifting his weight frequently. Hunt asked Leija where he was born and where he was coming from. Leija responded that he was born in California and that he was going to visit his sister in Dallas. At this point, Hunt was satisfied that Leija was not an alien.

Hunt proceeded to question the other two occupants still sitting in the white sedan. First, Hunt talked to Mr. Cortez the front passenger. Hunt asked the same questions of citizenship and destination plans. The man produced proof of citizenship and told Hunt that they were coming from Possum Kingdom Lake and were going to shop in Fort Worth. At all times during their conversation, Mr. Cortez looked straight forward, without eye contact with Hunt. Additionally, Mr. Cortez's muscles were clinched, and he was gripping the arm rest. Hunt testified that Mr. Cortez spoke in short quick answers.

Agent Hunt then questioned the rear passenger who was the wife of Mr. Cortez. Mrs. Cortez offered proof of her citizenship and appeared to be more calm, although she likewise never made eye contact with the officer.

Because of the inconsistent stories given by Leija and Mr. Cortez, along with the general nervousness of all three occupants, Hunt went to his car and retrieved a search consent form. The form was preprinted and provided that anyone asked to sign the form has the constitutional right not to have a search made of the vehicle without a search warrant, and the right to refuse consent to such a search. Leija took the form, read it, and without coercive threats or promises of any kind, Leija signed the form for consent.

Agent Hunt asked Leija for the keys, but Leija took the keys over to the rear of the vehicle and opened the trunk himself. Officer Hunt never asked Leija to open the trunk. Once the trunk was open, Hunt observed a large form under a light blue blanket in the front portion of the trunk. Hunt removed the blanket and saw a spare tire, a tool kit, and a specially wrapped large package. The special wrapping was familiar to Hunt as the type of wrapping

used to conceal marijuana and the smell commonly associated with marijuana. Hunt turned to Leija and asked him, "Where did you get the Mota?" Leija responded that he had found it. Subsequently, Hunt placed Leija under arrest, read him his rights, and placed him in the border patrol car. Likewise, Mr. and Mrs. Cortez were both placed under arrest. According to the officers, a little over 100 pounds of marijuana was seized.

## DISCUSSION

▉ The defendants' main contention is whether the officers had reasonable suspicion to proceed with the search of the vehicle once the defendants demonstrated their proof of citizenship. Although defense counsel appears to concede that the border patrol had reasonable suspicion to initially stop the defendants for being illegal aliens or involved in alien smuggling, it is incumbent upon the Court to first determine whether the initial stop of defendants' vehicle was constitutional. This is necessary because if the initial stop of defendants' vehicle cannot survive constitutional attack, then the subsequent search, although pursuant to a consent form, would be tainted by the original stop.

Section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(1), provides the authority for officers of the Immigration and Naturalization Service "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." Such authority, however, was defined and restricted by *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Following a balancing of the government's interests in maintaining the U.S. borders along with the fourth amendment rights of U.S. citizens, the Supreme Court held that the initial stop of a vehicle must be supported by reasonable suspicion. Such stops may be executed by the border patrols for the limited purpose of ascertaining

citizenship only if the agent is "aware of specific articulable facts together with rationale inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." [2]

The Court in *Brignoni–Ponce*, articulated several factors which officers or agents should weigh when deciding whether there is reasonable suspicion to stop a vehicle.[3] Such factors include:

(1) the characteristics of the area, proximity to the border, usual patterns of traffic on the particular road, and previous experience with alien traffic;

(2) information about recent illegal border crossings in the area;

(3) driver's behavior (i.e. erratic driving or obvious attempts to evade officers);

(4) aspects of the vehicle itself (i.e. heavily laden vehicles, common carrier type vehicles with large load capacity);

(5) characteristics of the occupants of vehicle including apparent Hispanic ancestry.

The Supreme Court explained that officers or agents charged with the responsibility of detecting illegal entrant aliens cannot wholly base their suspicions on any one particular circumstance. Instead, the determination "must turn on the totality of the particular circumstances." *Id.* at 885, n. 10, 95 S.Ct. at 2582, n. 10.[4] The *Brignoni–Ponce* Court further held that in determining whether to stop a vehicle, the agent "is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.[5]

In *Brignoni–Ponce*, border patrol agents stopped a vehicle solely because the occupants of the vehicle were apparently of Hispanic origin. The Supreme Court held that *the stop of individuals solely because of their Hispanic appearance is not reason-*

---

**2.** *Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582.

**3.** *Id.* at 884–85, 95 S.Ct. at 2581–82.

**4.** *See also, United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

**5.** *Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. at 2582.

able under the constitution.[6] In *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Court upheld the stop because the agent had the benefit of almost all of the factors articulated in *Brignoni–Ponce*. Since the only two Supreme Court decisions applying the *Brignoni–Ponce* factors to roving border patrols, (*Cortez* and *Brignoni–Ponce*), fall at two extremes, what constitutes reasonable suspicion is a question whose answer unfortunately lies in the gray mass of the law.

In order to base its determination, this Court will apply the factors articulated in *Brignoni–Ponce* and construe their importance relying on the authorities arising in the Fifth and Ninth Circuits.[7] The Court will then determine, based on the totality of the circumstances, whether the facts as supported by the testimony of Agent Hunt and Officer Rangel, sufficiently justify a reasonable suspicion to stop the defendants' vehicle. Each fact is therefore important in the Court's analysis.

The facts support the following summary: Agent Hunt's suspicions were founded on (1) the lack of animation on the part of defendants; (2) the size of defendants' trunk; (3) the apparently laden down rear end of defendants' vehicle; (4) the ancestry of defendants; and (5) the geographic location of defendants' vehicle.

In one of its most recent decisions applying the *Brignoni–Ponce* standards to roving border patrol stops, the Fifth Circuit reaffirmed the notion that "a threshold consideration is whether the vehicle has come from the border." *United States v. Orona–Sanchez*, 648 F.2d 1039, 1042 (5th Cir.1981). Quoting *United States v. Lamas*, 608 F.2d 547, 549 (5th Cir.1979), the *Orona–Sanchez* court aptly noted:

> In a number of recent decisions, this Court has stated that a vital element of the *Brignoni–Ponce* test is whether the agent had 'reason to believe that the vehicle had come from the border.'

*United States v. Ballard*, 600 F.2d 1115, 1119 (5th Cir.1979); *United States v. Rivera*, 595 F.2d 1095, 1098 n. 4 (5th Cir.1979); *United States v. Lopez*, 564 F.2d 710, 712 (5th Cir.1977); *United States v. Escamilla*, 560 F.2d 1229, 1231 (5th Cir.1977); *United States v. Woodard*, 531 F.2d 741, 743 (5th Cir.1976); *United States v. Martinez*, 526 F.2d 954, 955 (5th Cir.1976); *United States v. Del Bosque*, 523 F.2d 1251, 1252 (5th Cir. 1975) (per curiam). We have found this element of the *Brignoni–Ponce* test missing where the stop occurred a substantial distance from the border. *See United States v. Lopez*, 564 F.2d 710, 712 (5th Cir.1977) (55 miles from border. *United States v. Escamilla*, 560 F.2d 1229, 1230 (5th Cir.1977) (70 miles from border); *United States v. Martinez*, 526 F.2d 954, 955 (5th Cir.1976) (50 miles from border); *United States v. Del Bosque*, 523 F.2d 1251, 1252 (5th Cir.1975) (per curiam) (60 miles from border).

The *Orona–Sanchez* court added to its list of supporting authority, *United States v. Pacheco*, 617 F.2d 84 (5th Cir.1980) (85 miles from the border).

In the instant case, the testimony of Agent Hunt revealed that the point at which the defendants were stopped was approximately 8–10 driving hours or some 400 miles from the Mexican border. Nevertheless, Agent Hunt testified that Interstate 20 is a major route for alien smuggling and that from his experience, he knew that Dallas is a funnel point for alien smuggling. Although Hunt's testimony was replete with details of his extensive experience as a border agent in San Diego, the Court is not inclined to place a significant amount of weight on Agent Hunt's suspicions arising out of the defendants' vehicle travelling from the West on I–20. The stop occurred some 400 miles from the border and in his 3 months of observing traffic on I–20 and I–35, Agent Hunt testified that he had stopped ten vehicles and out of those ten, only two vehicles were

6. *Id.* at 886, 95 S.Ct. at 2582.

7. The Court will take judicial notice of the fact that the majority of the court opinions relating

to border patrol stops arise in the Fifth and Ninth Circuits.

found to have been concealing illegal aliens. The absence of any more evidence to the contrary "leaves the case to be decided solely on the remaining facts and circumstances with no [further] inferences to be drawn on the assumption that the travellers had come from the border." [8]

■ Both Agent Hunt and Officer Rangel testified that their suspicions were raised because of Leija and Cortez's behavior once they came upon the border patrol car. Agent Hunt and Officer Rangel testified that the defendants suspended all animation once their vehicle came upon the border patrol's car. Because there is no controverting evidence to support otherwise, the Court does not question that the occupants inside defendants' vehicle ceased animation upon passing the patrol car. The Court is troubled because the Government asks this Court to find reasonable suspicion largely in part because the defendants failed to look at the border patrol's car while Officer Rangel tried to indulge his curiosity. Interestingly enough, Agent Hunt testified that the failure to look, or the "ostrich syndrome," was common among illegal aliens or alien smugglers.

The courts' decisions have been consistent in these "failure to look" cases.

> We [Fifth Circuit Court of Appeals] have stated often that, because of the precarious position travellers on our nation's highways would be placed in if avoiding eye contact with an officer could be considered a suspicious reaction, "[t]his particular factor cannot weigh in the balance in any way whatsoever." *United States v. Lamas*, 608 F.2d 547 (5th Cir. 1979), *quoting United States v. Escamilla*, 560 F.2d at 1233.

The Court in *United States v. Lopez*, 564 F.2d 710 (5th Cir.1977), further ratified this position by saying, "[r]easonable suspicion should not turn on ophthalmological reactions of the appellant [defendant]." [9] The Court in *Escamilla* also disregarded the

failure to look as a factor in determining reasonable suspicion. The *Escamilla* Court logically reasoned that if on the one hand the Court finds that glancing repeatedly at border patrol agents constitutes reasonable suspicion,[10] and on the other hand, the Court finds that the failure to glance at the agents constitutes reasonable suspicion, the situation becomes a "heads I win, tails you lose," where the government is calling the toss and only the defendant can lose.[11] For these reasons, the Court will not consider the defendants' failure to look at the border patrol car as a factor in determining whether the border patrol agents had reasonable suspicion to stop defendants' vehicle.

Agent Hunt testified at length about his experience with the types of vehicles used by and for illegal aliens. Hunt testified that large sedans with large trunk capacity are essential to the alien smuggler. Hunt testified that the defendants' vehicle is typical of the vehicles used in alien smuggling. Hunt further testified that the vehicle was heavily laden down in the rear by what appeared to be excess weight in the trunk. A photograph was introduced into evidence as Government Exhibit 3 which depicts a rear view of defendants' vehicle as it looked with the 100 pounds of marijuana in the trunk. Government Exhibit 3 is taken at the eye level of the officer taking the photograph while standing approximately 15–20 feet away. Since Government Exhibit 3 was not taken from the officers' view from their car, it does not depict precisely what the officers testified to seeing as they pursued the defendants. Agent Hunt and Officer Rangel both testified that the defendants' vehicle was heavily laden down and that the rear end was so low that the car's gasoline tank, which would normally be in plain sight, was not in sight due to the vehicle's sagging rear. Although the exhibit demonstrates that the rear of the vehicle is lower than the front end, it

---

8. *United States v. Escamilla*, 560 F.2d at 1232.

9. *Lopez*, 564 F.2d at 712.

10. *United States v. Barnard*, 553 F.2d 389, 391–92 (5th Cir.1977) (the Court found reasonable

suspicion where occupants of vehicle glanced repeatedly and nervously at a border patrol agent.)

11. *United States v. Escamilla*, 560 F.2d at 1233.

does not clearly depict a heavily laden down rear end. After having reviewed the photograph, the Court finds that defendants' vehicle does not appear to look distinguishable from that of any other vehicle on the road.

Finally, the officers testified that as they first saw the occupants of the vehicle, later determined to be two of the defendants, they noticed the apparent Hispanic ancestry of all three occupants of the vehicle. The appearance of Hispanic ancestry is a factor, however, as previously mentioned, the Court in *Brignoni–Ponce* specifically held that the apparent race or origin of an individual alone does not give rise to reasonable suspicion for border patrol stops.

The Ninth Circuit recently applied the *Brignoni–Ponce* test in *United States v. Hernandez–Alvarado*, 891 F.2d 1414 (9th Cir.1989). In that case, there were several factors on which the agents based their suspicions. Such factors included the proximity to the border (approximately 8 kilometers); the defendant's use of a large Oldsmobile with large trunk capacity, defendant's rigid posture with "tunnel vision"; the sudden reduction of speed by defendant's vehicle; the fact that the vehicle in question displayed a license plate frame indicating that the vehicle had been bought by a dealership known to be associated with narcotics activity; the presence of a two-way radio antenna on the vehicle which is commonly used by smugglers; and defendant's nervous glances in the rearview mirror. Although the district court denied defendant's motion to suppress, the Ninth Circuit Court of Appeals reversed the district court stating that the defendant's behavior and surrounding circumstances as noted by the agents, described too many innocent people.

When considered in their totality, the factors enumerated in the instant case are insufficient to justify an investigatory stop. Certainly, inferences could be drawn from the facts given, but the facts do not support enough to give rise to reasonable suspicion. Similar to *Hernandez–Alvarado*, the facts in this case describe too many innocent travellers on the Texas highways.

For the Court to uphold this stop would mean that all Mexican-Americans with large Oldsmobiles travelling on vacation or otherwise from the West, would be subject to an investigatory stop. The Court cannot allow this, nor does the constitution allow such an arbitrary stop.

In this case, the officers' hunch apparently reaped large benefits by the seizure of the marijuana. However, the constitution safeguards its citizens against this arbitrary and capricious type of seizure. With respect to the impingement on constitutional liberties, the end rarely justifies the means and this is no exception. The longstanding case *Terry v. Ohio*, affirms this principal in the Supreme Court's finding that a detention cannot be justified by an officer's "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

It is uncontroverted that Leija voluntarily gave his consent to the search of his vehicle. However, the illegal detention of defendants' vehicle tainted the resulting search. Leija's consent, although voluntarily obtained, was proffered as a direct result of the illegal detention. Therefore, the rules of exclusion must be applied in the interests of constitutional justice.

This Court is ever-mindful of the "war on drugs" and the hardships faced by those law enforcement personnel joined in the "fight." The "war," however, must be fought using only the legal means necessary to effectuate the goals of stopping the drug trade. To do otherwise, would result in a war on the constitution, whereby, the battlefield would behold the obliteration of the liberties and freedoms of the citizens of this great country.

In view of the foregoing, defendants Leija and Cortez's motion to suppress the evidence identified in the indictment is GRANTED. Because the suppressed matters appear to be essential to prosecution, counsel are directed to appear at a status call at 9:00 a.m., May 14, 1990, to discuss any anticipated further proceedings. De-

fendants Leija and Cortez's presence at that status call is waived.