**UNITED STATES of America, Plaintiff,**

v.

**Jose ABDON–LIMAS, Defendant.**

**No. CR 91–476 JP.**

United States District Court,
D. New Mexico.

Nov. 20, 1991.

Charles Barth, Asst. U.S. Atty., Albuquerque, N.M., for U.S.

Richard C. Cauble, Las Cruces, N.M., for defendant.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The subject of this Memorandum Opinion and Order is defendant's motion to suppress. After careful consideration of the facts in this case, and the relevant case law, I have determined that defendant's motion should be granted.

Mid-day on September 11, 1991, Guillermo Torres, an agent with the U.S. Border Patrol, was patrolling southbound on State Highway 185 ("185") between Rincon and Radium Springs, New Mexico, approximately 70 miles north of the border with Mexico. Agent Torres was driving a marked border patrol vehicle. He was in uniform and was traveling with another agent, Valeria Justice. As he approached a northbound 1977 blue Chrysler, he noticed that it had Colorado license tags and four occupants who "appeared to be Hispanic," none of whom looked at him or his vehicle as the cars passed. This led Agent Torres to believe that the four occupants "had something to hide" because in his experience most people in passing cars look at his marked patrol vehicle.

185 begins at Las Cruces, New Mexico and runs northward to Hatch.[1] At Hatch,

---

**1.** State Highway 185 was also referred to as Highway 85 in the testimony. Examination of the Official Highway Map of New Mexico re-

veals that, with the exception of a small segment of old U.S. Highway 85 north of Truth or Consequences which still remains, United States High-

185 becomes State Highway 187 which continues northward through the towns of Salem, Garfield, Derry and Arrey. Just north of Arrey, the State Highway joins I-25, south of Truth or Consequences, New Mexico. 185 is on the west side of the Rio Grande. I-25 runs from south to north, on the east side of the Rio Grande, virtually parallel to 185.

In the area where Agent Torres observed the defendant's vehicle, there is a permanent border patrol checkpoint on 185 which was closed on September 11, 1991. Across the river, in the same area, there is a permanent border patrol checkpoint on I-25 which was open on September 11, 1991. In his personal experience working with the Border Patrol for the last 3 years, Agent Torres had been involved with six or seven narcotic cases and twenty to twenty-five alien smuggling cases in the stretch of 185 between Radium Springs and Rincon.

According to Agent Torres, when the checkpoint on I-25 is open, alien smugglers attempt to circumvent the I-25 checkpoint by using 185 and that is when the border patrol intercepts a lot of smugglers. "[185] is notorious for aliens and for narcotic smuggling. We've caught vehicles with Colorado tags and most people from Colorado are going to take the Interstate 25 instead of 185. It's a safer and faster route."

Agent Torres testified that the type of traffic he normally saw on the stretch of 185 on which he was traveling on September 11, 1991 was local people or "farmland traffic" because this stretch is in a farming area. There are no tourist attractions or businesses along that stretch of 185 between Radium Springs and Rincon. 185 in this area is "a windy road and it's more dangerous and not as safe as the interstate." Vehicles can travel north on 185 and pick up I-25 on the way to Truth or Consequences. Agent Torres believed that

travelers might choose to take 185 instead of I-25 in that area if they had relatives or knew someone who lived along 185 or if they worked on one of the farms or ranches in the area. In addition, he believed that some people would think that 185 was a more scenic route.

After passing the 1977 Chrysler, Agent Torres decided to follow the vehicle "due to the subject's behavior [that is, not looking at him], and the out-of-state tags ... on that particular highway." He made a u-turn and began following the 1977 Chrysler north on 185. Torres testified that at that point he had not decided to stop the vehicle which was traveling at 55 miles per hour, the posted speed limit. Torres approached the Chrysler. When he was approximately 75 yards behind it, the Chrysler "slowed down tremendously" to about 30 to 35 miles per hour. In Agent Torres' experience, when a driver perceives that a law enforcement vehicle is following, if speeding, the driver reduces speed to the legal limit, and others who are not speeding might drop two or three miles per hour. Agent Torres attached significance to the fact that the vehicle slowed down because "on previous experience on loads or smuggling cases, most vehicles will do that, they slow down tremendously." [2]

Agent Torres then moved his vehicle into the passing lane and pulled up beside the Chrysler, about three to four feet from it, and maintained that position for about five to ten seconds, during which time, none of the occupants turned to look at him. The driver looked straight ahead and the three passengers looked to their right, away from Agent Torres. In Agent Torres' experience, some people, depending on their cultural background, consider it appropriate to look at a law enforcement officer in close proximity but others would consider it impolite to do so. Agent Torres also

way 85 runs coincident with I-25, which replaced old Highway 85, from Las Cruces, north, all the way to the Colorado border.

2. Agent Torres also testified that when he pulled up behind the 1977 Chrysler, the passengers "slouched down" in their seats. However, as brought out on cross-examination, Torres did

not include this fact in his police report which did include the fact that the passengers would not look at him. Based on this gap in the report, I have not considered the "slouching down" testimony in my determination of reasonable suspicion.

testified that he did not know the cultural background of the occupants of the car simply by looking at them.

Agent Torres then decided to stop the vehicle for the purpose of inquiring about the occupants' citizenship. To do this he slowed down, fell in behind the Chrysler and turned on his emergency lights and the vehicle pulled over to the side of the road. Agent Torres and Agent Justice approached the vehicle. Agent Torres identified himself and asked about the occupants' citizenship. The driver said he was a United States citizen and the passengers said they were here illegally from Mexico.

Recently, the Tenth Circuit Court of Appeals has decided three cases dealing with agents on roving patrol in the same general area as in the case at bar and has determined what does and does not constitute reasonable suspicion to stop a vehicle suspected of an immigration violation. In each factually distinct case, the court has applied the test established by the United States Supreme Court in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) in order to determine whether there existed "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2582. Factors which may be considered are:

1) the characteristics of the area in which the vehicle is stopped;
2) patterns of traffic on the road;
3) proximity to the border;
4) previous experiences with alien trafficking in the area;
5) information about recent border crossings;
6) attempts to evade detection;
7) appearance of the vehicle;
8) appearance and behavior of the driver and passengers;
9) other relevant information.

*Id.* at 884–885, 95 S.Ct. at 2581–2582.

In *United States v. Pollack*, 895 F.2d 686 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 520, 112 L.Ed.2d 532 (1990), the appellate court upheld the lower court's decision that there was reasonable suspicion to justify stopping the defendant. In that case, the defendant, who was driving a large Buick, was stopped between 3:00 and 3:45 a.m. just north of Truth or Consequences after sensors indicated that two vehicles were traveling close together on old Highway 85 which, at that location, runs parallel to I–25 and circumvents the border patrol checkpoint on I–25. Old Highway 85 and I–25 intersect at Interchange 83 about two miles north of the I–25 checkpoint. The agents stopped the defendant at Interchange 83. Most significantly, the pickup which defendant's Buick was closely following had already gone northbound through the I–25 checkpoint where the occupants had declared their United States citizenship, but it had returned south to Truth or Consequences. Thereafter, the agents saw the pickup heading north again, this time on the circumvention route followed by the large Buick that defendant was driving. The border patrol agent attributed significance to the size of the Buick because it was large and capable of hauling a large number of people. The Buick appeared to be heavily loaded and was "riding lower in the rear end." *Id.* at 687. Furthermore, the defendant was traveling at a time when traffic was very unusual and when only a very small percentage of the traffic stopped by border patrol agents on old Highway 85 was legitimate traffic. *Id.* at 687. Based on the agent's experience, he believed the action of the lead pickup of going through the I–25 checkpoint with occupants who were United States citizens and then doubling back to lead another vehicle around the I–25 checkpoint by taking old Highway 85 "was a classic alien-smuggling pattern." *Id.*

The factors which led to denial of suppression in *Pollack* can easily be distinguished from those that led to the stop in this case. Defendant Abdon–Limas was not engaged in the back and forth maneuvering that was observed in *Pollack* which constituted a classic alien-smuggling pattern. Furthermore, Abdon–Limas was

stopped around noon, a time of no particular significance and a time when there certainly is legitimate traffic on the road he was traveling. Moreover, there was nothing unusual about the car Abdon–Limas was driving and his passengers were in open view, not concealed.

In *United States v. Monsisvais,* 907 F.2d 987 (10th Cir.1990), the Tenth Circuit reversed a denial of the defendant's motion to suppress based on a lack of articulable facts amounting to reasonable suspicion. In that case, the stop occurred at Exit 83 (Interchange 83), the same place as the stop in *Pollack.* Border patrol agents, on roving patrol, stopped a Chevrolet S–10 pickup truck with a camper shell which was first spotted at 7:30 p.m. on old Highway 85, after a sensor alert, at a point parallel to the permanent check point on I–25 near Truth or Consequences. The pick-up had Arizona plates, was "riding extremely heavy" and had two occupants. *Id.* at 988. The agent in *Monsisvais* testified, as did the agent in *Pollack,* that old Highway 85 was commonly used to by-pass the I–25 checkpoint which was open when defendant Monsisvais' vehicle was spotted on old Highway 85. He also stated "that he had previously found aliens concealed in pickup trucks with camper shells ... and 'we don't get many Arizona vehicles on the old highway there.'" *Id.* Finally, the agent testified that the driver of the vehicle changed his mind about which way to turn when he saw the border patrol vehicle at Interchange 83. Defendant's vehicle, which had been northbound on old Highway 85, turned southward onto I–25, 180 degrees from the direction it had been traveling, when it encountered the border patrol vehicle at the intersection. The agent testified that he considered this to be significant since such behavior is "not uncommon practice for aliens or aliens smugglers." *Id.* at 989. Given the facts outlined above, the Tenth Circuit Court of Appeals found that the border patrol agent did not have

reasonable suspicion to justify the stop. *Id.* at 990.

The *Monsisvais* court found the record to be lacking in certain crucial areas. Despite the agent's testimony explaining that old Highway 85 was used to circumvent the I–25 checkpoint, that Arizona plates are unusual and that, in his experience, cars carrying aliens change their route when they encounter a border patrol vehicle, the court did not attach any significance to these factors.

[W]e cannot conclude that Highway 85 has no significant legitimate traffic during the early evening hours. In short, the record does not provide us a basis for concluding that a vehicle's presence on Highway 85 at 7:30 p.m. is at all unusual, much less that it is suggestive of criminal conduct.

Similarly, the record does not enable us to attach any particular significance to the appearance of Arizona license plates in this area. Although Arizona cars must certainly be less common on this stretch of road than those bearing New Mexico plates, we cannot find any basis in the record from which to conclude that Arizona-plated vehicles are any more likely to be transporting aliens near Truth or Consequences than are vehicles bearing the license plates of New Mexico, or for that matter, Texas or Colorado.

We are also unable to ascribe any significance whatsoever to the driving maneuvers of appellant as he approached Highway 85's intersection with I–25 [because the agent admitted that the intersection (Interchange 83) is confusing to motorists.]

*Id.* at 990–991.

After eliminating the above three factors, the court said it was left to consider only the facts that appellant was traveling in a pickup truck with a camper shell that was "riding heavy" and concluded that this was insufficient to constitute reasonable suspicion. *Id.* at 992.[3] Following this

---

**3.** Initially, the *Monsisvais* court stated the question to be decided in the following manner: "Whether the Border Patrol agents operating the Truth or Consequences checkpoint may stop

every heavily loaded pickup truck bearing a camper shell and out-of-state license plates that travels northbound on this stretch of Highway 85 at 7:30 p.m.?" *Id.* at 990. Thus, in its origi-

reasoning, there is nothing in the record of this case which provides a basis to conclude that a vehicle's presence on 185 at mid-day is at all unusual, much less suggestive of criminal conduct, even though the checkpoint on I–25 was open and in Agent Torres' experience alien smugglers travel 185 more heavily when the I–25 checkpoint is open. Likewise, while in both this case and in *Monsisvais*, there was testimony that out-of-state license plates were unusual in the areas of the stops, there was no testimony that Colorado-plated vehicles are any more likely to be transporting aliens than vehicles bearing license plates of New Mexico or other states. After attributing no significance to the route driven by defendant Abdon–Limas and no significance to his Colorado plates, as *Monsisvais* instructs I must do, what is left that might constitute reasonable suspicion? Probably nothing under the *Monsisvais* rationale since the court in *Monsisvais* was "unable to ascribe any significance whatsoever to the driving maneuvers of appellant ..." *Id.* at 991.

The behavior of defendant Abdon–Limas and his passengers, that is, slowing down and not looking at the border patrol vehicle, seems no more significant than the perceived evasive turning maneuver of the defendant in *Monsisvais*. In both *Monsisvais* and this case, there were inconsistencies in the testimony of the agent regarding significance he placed on the defendant's behavior. In *Monsisvais*, the court found that "the inferences drawn here by Agent Goad from the fact that appellant turned south at the intersection cannot withstand rational analysis.... [N]o matter which direction appellant might have traveled upon reaching the intersection ...

his actions would have been 'suspicious' to Agent Goad. Plainly, not every suspicion that is 'articulable' is reasonable." *Id.* at 991–992.

Similarly, in this case, Agent Torres testified that he believed the occupants of defendant's vehicle were "nervous or had something to hide because most people, when they see our cars, from their cars, they look at us." However, later testimony revealed that Agent Torres believed that "people from different parts of the world or countries ... take the police or authority figures differently" and Torres agreed that "there are ... people that are going to consider it less appropriate to look right at an officer in terms of whether it's polite to do so." Thus, because Agent Torres did not know in this case whether he "had people who were likely to look right at an officer or not make eye contact," the suspicion raised by the lack of eye contact of the defendant and his passengers does not seem any closer to the reasonable suspicion needed for a stop than the suspicion caused by the defendant's unusual change of direction at Interchange 83 in *Monsisvais*.

Furthermore, even if the factors of defendant Abdon–Limas' dramatic decrease in speed and the occupants' lack of acknowledgement of the presence of the border patrol vehicle could be considered more suspicious than the unusual turn by the vehicle in *Monsisvais*, they definitely appear to be less suspicious than the combination of the unusual turn plus the remaining suspicious factors of *Monsisvais*—the apparently heavily loaded pickup traveling in the evening with a camper shell, which in the agent's personal experience was a type of vehicle used to smuggle aliens.[4]

---

nal formulation of the issue, the court seemed to be considering the out-of-state plates, but later, when the court stated the factors it had left to consider, that is, a pick-up truck with a camper shell that is "riding heavy," the court apparently was no longer considering the Arizona plates. Even though the agent had testified that Arizona plates were unusual in that area, in the final analysis, the court was unwilling to give this factor any weight.

**4.** Although the *Monsisvais* court eliminated factors to which it was unable to attach any

significance, and was subsequently left with only two of the significant factors detailed in *Brignoni–Ponce*, the court also acknowledged that the "totality of the circumstances" is to be taken into account when analyzing a stop:

> Based upon the whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity

*Id.* at 990 (quoting *United States v. Cortez,* 449 U.S. 411, 417–418, 101 S.Ct. 690, 694–695, 66 L.Ed.2d 621 (1981)). Thus, in interpreting the

Parenthetically, Agent Torres also testified that the occupants of the vehicle "appeared to be Hispanic." This factor, while not unusual in New Mexico, or anywhere in the United States for that matter, certainly is not indicia of criminal conduct. Many citizens of the United States "appear to be Hispanic." In *Brignoni–Ponce*, the court acknowledged the government's argument that "trained officers can recognize the characteristic appearance of persons who live in Mexico relying on such factors as the mode of dress and haircut." 422 U.S. at 885, 95 S.Ct. at 2582. However, Agent Torres gave no testimony about appearances that would suggest the occupants resided outside the United States.

Most recently, in *United States v. Miranda–Enriquez*, 941 F.2d 1081 (10th Cir. 1991), the Tenth Circuit again reversed a lower court's finding that a stop initiated by a roving border patrol agent was justified by reasonable suspicion. In that case, the defendant was stopped at 9:00 p.m. when he was driving north on New Mexico Highway 52 in a 1984 Datsun Nissan Sentra with Arizona plates near Truth or Consequences, 98 miles from the border with Mexico. Highway 52 is a dirt road that connects with I–25 and the agent testified that it is often used by vehicles containing alien smugglers, especially during night-time hours, to avoid the Las Cruces border patrol units. The defendant's car was heavily covered in powdery dust which the

border patrol agent considered significant since cars coming onto Highway 52 from another dirt road which is a well-documented smuggling route are covered in similar dust. However, the agent also testified that Highway 52 is heavily traveled by tourists visiting a lake along the road and that cars coming from the lake are also covered in similar dust.

The agent, who had worked for the border patrol for 11 years and had made two to three hundred arrests as a result of sensor alerts on Highway 52, responded to a sensor alert, tipped off by the defendant's car, and parked his border patrol car at the intersection of Highway 52, I–25 and Highway 85[5] perpendicular to Highway 52 with his headlights shining into the intersection. 941 F.2d at 1082. The agent testified that when the defendant's car approached the intersection, the driver "appeared to be 'frozen,' and did not look left or right, i.e., into the headlights of [the agent's] border patrol car." *Id.* The court concluded that the above outlined facts did not amount to reasonable suspicion to stop the defendant's vehicle.

As in *Monsisvais*, the court found the record to be lacking in evidence:

There was no testimony that Agent Johnston had received word that there had been recent illegal border crossings in the area, nor was there testimony that Agent Johnston thought that the Sentra

---

law of the United States Supreme Court, the Tenth Circuit seems to have determined that even when looking at the "totality of the circumstances," some of the circumstances which the officer believed created suspicion will not be taken into account by the court. I have analyzed the facts of this case accordingly and have thereby eliminated certain factors which Agent Torres relied upon which, according to the mandates of the Tenth Circuit, are of no significance.

In *Monsisvais*, before the process of elimination occurred, there was evidence of the following *Brignoni–Ponce* factors: factor (1) characteristics of the area in which the vehicle is stopped, that is, travel on a old Highway adjacent and parallel to an interstate; factor (2) patterns of traffic on the road, that is, the agent testified that Arizona plates are unusual and that the road is used to circumvent the permanent check-point on I–25; factor (3) the proximity of the area to the border; factor (4) previous expe-

riences with alien trafficking in the area, that is, the agent had previously found aliens concealed in pickup trucks with camper shells; factor (6) attempts to evade detection, that is, the defendant was driving a route that circumvented an open checkpoint on I–25 and changed his direction of travel when he noticed a border patrol vehicle; and factor (7) appearance of the vehicle, that is, it appeared to be extremely heavily loaded.

Similar factors are present in this case but, adhering to the reasoning of *Monsisvais*, I have concluded that, as in *Monsisvais*, they are not enough, when added to the other suspicious circumstances of this case, to rise to the level of reasonable suspicion.

5. Highway 52 connects with I–25 at Interchange 83, where Highway 85 also joins I–25. This intersection is where the stops in *Pollack, Monsisvais* and *Miranda–Enriquez* occurred.

contained concealed compartments or that it appeared to be heavily loaded. *Id.* at 1084. Likewise, in the case at bar, there was no evidence that Agent Torres had received word that there had been recent illegal border crossings in the area, nor was there evidence that the car appeared heavily loaded or contained concealed compartments. Furthermore, the *Miranda–Enriquez* court, like the court in *Monsisvais*, was not impressed with the testimony about the behavior of the defendant which the border patrol agent found to be suspicious. In *Miranda–Enriquez*, the court attached "little significance" to the fact that the defendant did not turn his head at the intersection and the court considered it prudent that the defendant did not to look into the lights of the border patrol vehicle which was parked at the intersection. *Id.* at 1085. Thus, according to the dictates of the Tenth Circuit, I attach little significance to the failure of defendant Abdon–Limas and his passengers to look at the border patrol vehicle.[6]

Comparing the facts concerning defendant Abdon–Limas to the facts in *Pollack*, *Monsisvais*, and *Miranda–Enriquez*, I conclude that, given the totality of the circumstances, Agent Torres did not have enough articulable facts to justify stopping defendant's vehicle.[7] In *Pollack*, where the court found there was reasonable suspicion, the court had the very specific, and suspicious circumstance of a pickup being seen, first traveling northbound through the checkpoint on the interstate, and then again, a short time later on a back road circumventing the checkpoint with another vehicle closely following it. The facts in this case are far more analogous to the facts in both *Monsisvais* and *Miranda–Enriquez*. Of course, each is factually different from the other. I cannot conclude, however, that the factual differences in this case are significant, or weighty, enough to arise to the level of reasonable suspicion if it did not exist in *Monsisvais* or *Miranda–Enriquez*.

In both *Monsisvais* and *Miranda–Enriquez*, as in this case, the defendants were spotted on a road that was known by border patrol agents to be used by smugglers trying to avoid border patrol agents or circumvent an open fixed checkpoint on I–25. Also in all three cases, the defendants' cars bore out-of-state license plates and in *Monsisvais*, and this case, the agent testified that such plates were unusual in the area. In all three cases, the border patrol agents noticed some kind of behavior on the part of the occupants of the spotted vehicles which they found to be suspicious due to their previous experience. However, in *Monsisvais*, the court refused to attach any significance to the fact that the

---

**6.** It is noteworthy that the *Miranda–Enriquez* court suppressed the evidence despite the number of *Brignoni–Ponce* factors which were established: factor (1) characteristics of the area in which the vehicle is stopped, that is, travel on a back dirt road; factor (2) patterns of traffic on the road, that is, the road is used by illegal alien smugglers to avoid the interstate checkpoint, especially at night; factor (3) proximity to the border, that is, 98 miles from the border with Mexico; factor (4) previous experiences with alien trafficking in the area, that is, the agent had made hundreds of arrests on that same stretch of Highway 52 as a result of sensor alerts; factor (6) attempts to evade detection, that is, using a dirt road instead of the nearby interstate to avoid the checkpoint; factor (7) appearance of the vehicle, that is, covered in dust similar to other cars coming from a well documented smuggling route; and factor (8) appearance and behavior of driver and passengers, that is, the driver appeared frozen and did not look right or left before turning onto another highway.

**7.** Clearly, there is no specific number or combination of *Brignoni–Ponce* factors which automatically rises to the level of reasonable suspicion. Instead, it is the overall picture created by the sum total of the factors which must be considered. As previously noted, while the Tenth Circuit in each of these three cases considered the *Brignoni–Ponce* factors and the "totality of the circumstances" test, it is clear from the rulings that the court believes that evidence of the presence of many of these factors may still be insufficient to amount to reasonable suspicion. In *Monsisvais*, a combination of factors 1,2,3,4,6 and 7 was not enough. In *Miranda–Enriquez*, the sum of factors 1,2,3,4,6,7 and 8 fell short. In *Miranda–Enriquez*, the court stressed the absence of factor (5), information about recent border crossings, but it was also absent in *Pollack*. However, *Pollack* had factor (9), other relevant information of highly suspicious conduct, that is, the maneuvering in a classic alien smuggling pattern, which was lacking in the other two cases and is also lacking in the present case.

driver seemed to change his mind about his turn when he spotted the border patrol unit and in fact changed his direction 180 degrees back toward the direction from which he had been traveling. In *Miranda–Enriquez*, the court attached no significance to the fact that the defendant did not turn his head at the intersection and look toward the border patrol unit's headlights. Finally, in all three cases, the agents testified that alien smugglers had been caught in similar situations in the past.

Specific to this case is the fact that when Agent Torres approached the defendant's car, it slowed down from 55 miles per hour to about 35 miles per hour. Then, when Agent Torres drove beside the defendant's vehicle, none of its occupants looked over at the border patrol unit. I cannot conclude, however, that such facts, even if considered unusual, create a suspicion of criminal conduct that is reasonable. In *Monsisvais*, despite the distinct facts that the defendant was traveling in a pick-up with a camper shell which was "riding extremely heavy," and made a 180 degree change in direction when it encountered the border patrol vehicle, the court still found no reasonable suspicion to stop the car. Is a car which reduces its speed in the presence of the border patrol vehicle and contains occupants who are unwilling to look at the border patrol vehicle more suspicious than a pickup with a camper shell "riding extremely heavy" which makes a virtual u-turn upon seeing a border patrol vehicle? I conclude that it is not.

In *Miranda–Enriquez*, and in the case at bar, the government provided much of the information lacking in *Monsisvais*, that is, characteristics of the area in which the vehicle was encountered, the proximity of the area to the border, the usual patterns of traffic on the road, and the agent's previous experience with alien traffic. Yet, the *Miranda–Enriquez* court was still unwilling to conclude that

> every out-of-state driver traveling on New Mexico Highway 52 at 9:00 p.m. with a dusty car who does not turn her or his head to look for oncoming cars at the intersection of Highway 52, I–25 and U.S. Highway 85, 98 miles from the Mex-

ican border, can be stopped and questioned by the Border Patrol.

*Id.* at 1083. Similarly, given the Tenth Circuit case law and the totality of the circumstances in this case, I am precluded from concluding that every out-of-state vehicle traveling north on 185 at mid-day which dramatically slows down when approached by a border patrol vehicle and which contains occupants who appear to consciously avoid looking at the border patrol vehicle, even when it pulls up alongside their vehicle, can be stopped and questioned by the border patrol.

IT IS THEREFORE ORDERED that defendant's motion to suppress is GRANTED.