**UNITED STATES of America, Plaintiff,**

**v.**

**Rodolfo VENZOR–CASTILLO, Defendant.**

**Cr. No. 92–324 JP.**

United States District Court, D. New Mexico.

Aug. 19, 1992.

---

684

Beatriz V. Ferreira, Ferreira Law Offices, Las Cruces, NM, for Jose Rogelio Aquino–Ramos.

Charles A. Harwood, Silver City, NM, for Rodolfo Venzor–Castillo.

Kelly H. Burnham, U.S. Attorney's Office, Las Cruces, NM, for U.S.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

In this Memorandum Opinion and Order I revisit issues discussed in *United States v. Abdon–Limas*, 780 F.Supp. 773 (D.N.M. 1991). Defendant has moved to suppress evidence claiming that while he was traveling on New Mexico Highway 36 he was stopped illegally in violation of the Fourth Amendment. Based on the following facts which were established at an evidentiary hearing on August 4, 1992, I conclude that defendant's motion to suppress should be granted.

On June 14, 1992, David Smith, a United States Border Patrol Agent with more than ten years experience, was patrolling New Mexico State Highway 36 in the northern part of Catron County, New Mexico, looking for vehicles smuggling illegal aliens. The nearest highway crossing from the Republic of Mexico into the United States of America was approximately 235 miles to the south by road. The point where Agent Smith stopped the defendant was more than 200 air miles from the Mexican border. Highway 36 does not go directly to the border. The most direct route from the nearest border crossing point (Palomas, Mexico) to the place of the stop on Highway 36 passes through thirteen towns or cities in New Mexico (Columbus, Deming, Hurley, Central, Silver City, Cliff, Buckhorn, Pleasanton, Glenwood, Alma, Reserve, Apache Creek and Quemado.)[1] *See* defendant's Exhibit A. The section of New Mexico Highway 36 on which Agent Smith observed the defendant's car was a segment of the highway route that extends from the border with Mexico to I–40, an east-west interstate. This route traverses N.M. Highway 11, U.S. Highway 180, N.M. Highway 12, N.M. Highway 32, N.M. Highway 36, and finally N.M. Highway 117. It bends westward to skirt the Gila Wilderness.

Based on his personal experiences and current reports from local law enforcement personnel, Smith knew that, as a result of the recent closing of two checkpoints in the I–25 corridor, alien smuggling had increased in the Catron County area since more smugglers were traveling westward into the system of roads in Catron County from the Interstate 25 corridor at a point south of the permanent checkpoint on I–25 near Truth or Consequences, New Mexico which remained open. During the 30 days preceding Smith's assignment to the area, authorities had reported nine cases from the area involving thirty illegal aliens. Because of the recent increase in alien smuggling in the north Catron County area, Smith's supervisors had decided to have agents begin patrolling there and sent Smith to patrol the area for a week. However, Agent Smith had received no information that defendant's vehicle had recently crossed from Mexico into the United States.

Agent Smith parked his patrol vehicle, facing east, on the west side of Highway 36 about twelve feet from the edge of the roadway. Smith's patrol vehicle was a Chevrolet Suburban marked with a United States Border Patrol emblem and emergency lights mounted on its top. As parked, it was easily visible to northbound traffic approaching from the south on Highway 36. Agent

---

1. The route Agent Smith apparently assumed the defendant travelled—north from Mexico in the I–25 corridor then westward on New Mexico Highway 152 into Catron County—totals approximately 350 road miles.

Smith, his co-agent, and a third off-duty United States Border Patrol agent from out-of-state were standing outside of their two parked vehicles beside Highway 36 observing northbound vehicles as they came around a curve several hundred yards south of Smith's position.

At approximately 4:00 p.m., within half an hour of arriving at this location, Agent Smith saw the car driven by the defendant as it moved around the curve. At first, Smith had a side view of the car and observed four to five occupants seated upright. However, after the car had completed the curve and was approaching Smith, he saw the back seat passengers slide or "scrunch" down.

As the car passed him, Smith noted that it seemed to have fewer occupants than when he first observed it; that it appeared to be heavily loaded with its undercarriage close to the road surface and a tailpipe which dragged on the road when the car hit bumps; that the vehicle was a large, older model Cadillac which in Smith's experience was a type favored by alien smugglers; and that the three occupants in the front seat stared straight ahead as they passed by Smith instead of looking toward him and his companions or the marked patrol car. This conduct seemed unusual to Smith since in his experience most travelers look toward marked law enforcement vehicles parked next to a highway with persons standing beside them in remote highway stretches such as this.

Agent Smith and his partner then got into their Suburban and followed defendant's car northward for a few miles. Agent Smith's partner drove. Agent Smith observed that instead of a license plate, defendant's car had a temporary license located in the rear window. Using binoculars, Smith detected the tops of three heads in the back seat of the car as he and his partner tailed it. Also, while following the car, Smith noticed that it continued to ride low and to strike the road surface occasionally. Defendant's car was driving at the speed limit. Smith then stopped the car, determined that the five passengers were aliens illegally in the United States, and arrested the driver, the defendant.

In *United States v. Abdon–Limas, supra,* written near the end of 1991, I reviewed the three cases from the Tenth Circuit Court of Appeals, which had been decided during 1990 and 1991, that had applied the test established by the United States Supreme Court in *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) to determine the propriety of highway stops by roving patrol agents. Based on my understanding of a synthesis of those three cases— *United States v. Pollack,* 895 F.2d 686 (10th Cir.) *cert. denied,* 498 U.S. 985, 111 S.Ct. 520, 112 L.Ed.2d 532 (1990); *United States v. Monsisvais,* 907 F.2d 987 (10th Cir.1990); and *United States v. Miranda–Enriquez,* 941 F.2d 1081 (10th Cir.1991)—I concluded that under the facts established in *United States v. Abdon–Limas, supra,* the three recent Tenth Circuit cases compelled a conclusion that defendant Abdon–Limas had been stopped illegally in violation of his Fourth Amendment rights. However, only a half-year later on July 1, 1992, the Tenth Circuit Court of Appeals issued an opinion in *United States v. Barbee,* 968 F.2d 1026 (10th Cir. 1992), which seems to limit the applicability of the ruling in *United States v. Monsisvais, supra,* and totally ignored the opinion in *United States v. Miranda–Enriquez,* the two cases that I felt were most compelling in dictating the result I reached in *United States v. Abdon–Limas, supra.*[2]

Although the Court in *United States v. Barbee* noted that the record "could have been stronger," it concluded that the following factors supported a finding of reasonable suspicion by a roving patrol agent to stop a vehicle on the highway: (1) the vehicle was traveling northbound, (2) on a highway known to be used commonly by alien smugglers, (3) because it avoided a permanent border checkpoint at Truth or Consequences, New Mexico, (4) the vehicle had out-of-state license plates, (5) it was traveling in the evening after dark, (6) travel was during February, a month when there is little traffic on that road, (7) there were several occupants, and (8) when the agent's headlights illuminated the car the passengers in the back seat crouched down. The opinion did

**2.** Had *United States v. Barbee, supra,* been issued prior to my ruling in *United States v. Abdon–*

*Limas, supra,* I likely would have reached a different result in that case.

686

not indicate the distance of the point of the stop from the border with the Republic of Mexico, but the opinion implies that the stop was on old highway 52 near the checkpoint at Truth or Consequences, New Mexico which is approximately 100 miles from the Mexican border. Certain factors established at the evidentiary hearing in this case are essentially the same as some of the factors on which the Court relied in the *Barbee* opinion to support a finding of reasonable suspicion: (1) defendant Venzor–Castillo was travelling northbound, (2) on a highway recently reported as being used with increasing frequency by alien smugglers, (3) because it avoided an open checkpoint at Truth or Consequences, New Mexico. Similar to other factors on which the Court relied in the *Barbee* opinion are the facts that defendant Venzor–Castillo had a temporary New Mexico permit in his rear window instead of a regular license plate, he was transporting five passengers, and when his car approached Agent Smith the passengers in the rear seat crouched down while defendant and the two passengers in the front seat stared fixedly ahead instead of looking at Agent Smith. Both old Highway 52 which was involved in *United States v. Barbee* and Highway 36, the subject of this case, are lightly travelled highways in rather remote areas of New Mexico. Unlike other factors on which the Court relied in *Barbee,* defendant Venzor–Castillo was traveling during the afternoon instead of after dark and during a summer month when vacationers frequently are on the highway.

The most striking factual distinction between this case and all of the Tenth Circuit opinions, including *Barbee,* which have addressed the subject is the distance of the stop from the border with Mexico. In all of the cases in which the Tenth Circuit has published opinions, it appears that the stops occurred not more than 100 air miles from the border, whereas in this case Agent Smith made the stop approximately 235 road miles and more than 200 air miles from the border. Given the fact that the stop in this case occurred more than twice the distance from the border than the stops in the reported Tenth Circuit cases, irrespective of whether the appellate court determined in a particular case that the stop was legal or illegal, considerable weight must be given to the

factor of distance from the border in considering the totality of circumstances.

Distance from the border is of peculiar importance in this case because of a legislative limitation on the range within which United States border patrol agents, such as Agent Smith, may patrol in an effort to detect alien smuggling. 8 U.S.C. § 1357(a)(3) authorizes immigration officers "within a reasonable distance from any external boundary of the United States ... [to] board and search for aliens ... any railway car, aircraft, conveyance, or vehicle ..." *Under* current regulations, this authority may be exercised anywhere within 100 air miles of the border. 8 CFR § 287.1(a)(2). Although the Tenth Circuit has noted in dicta that this Congressional authorization does not foreclose searches beyond the 100 mile limit as long as Fourth Amendment considerations are met, *United States v. Leyba,* 627 F.2d 1059, 1065 (10th Cir.1980), the Tenth Circuit has never reached this issue in a case where the search actually occurred more than 100 air miles from the border.

Furthermore, in *United States v. Brignoni–Ponce, supra,* the United States Supreme Court seemed to assume that a roving stop must occur within 100 air miles of an external border when deciding that an agent on roving patrol must have reasonable suspicion to stop a car to determine if the car contains aliens illegally in the United States. After specifically noting that there is a 100 air mile limitation on the Border Patrol's authority to conduct warrantless searches, the court stated:

> The Border Patrol interprets [8 U.S.C. 1357(a)(3) ] as granting authority to stop moving vehicles and question the occupants about their citizenship, even when its officers have no reason to believe that the occupants are aliens or that other aliens may be concealed in the vehicle. But no act of Congress can authorize a violation of the Constitution, and we must decide whether the Fourth Amendment allows such random vehicle stops in the border areas.

422 U.S. at 877–878, 95 S.Ct. at 2578. The Court went on to conclude that Border Patrol agents do indeed need reasonable suspicion

to stop or detain persons for questioning about their citizenship within the 100 air mile limit imposed by the regulation. "The effect of our decision is to limit exercise of the authority granted by ... [8 U.S.C. § 1357(a)(3) ]." *Id.* at 884, 95 S.Ct. at 2582.[3]

Notwithstanding the freshness of the opinion in *United States v. Barbee, supra,* and its apparent erosion of the rulings in *United States v. Monsisvais, supra,* and *United States v. Miranda–Enriquez, supra,* I conclude that based on the totality of the circumstances in this case, the defendant's motion to suppress should be granted. The distance of the stop from the border, coupled with the fact that the route to the closest border crossing point leads through 13 different United States towns or cities before reaching the point of the stop, and the absence of specific information that defendant's vehicle recently had crossed the border, suggest that Agent Smith lacked reasonable suspicion to believe that the Cadillac was coming from the border area and that alien smuggling was occurring when he stopped the defendant's vehicle.[4]

IT IS THEREFORE ORDERED that defendant's motion to suppress is GRANTED.

COMPARISON OF FACTORS THE TENTH CIRCUIT HAS CONSIDERED

| CASE: | Leyba | Pollack | Mons. | Miranda | Barbee | Limas | Venzor |
|---|---|---|---|---|---|---|---|
| NIGHT | X | X | X | X | X | | |
| WINTER | | | X | X | X | | |
| OUT OF STATE | X | X | X | X | X | X | TEMP. UN-CLEAR |
| ODD DRIVING | X | | X | | | X | |
| HEAVY LOAD | X | X | X | | | | X |
| NO EYE CONTACT | X | | | X | | X | X |
| LARGE VEHICLE | | X | X | | | | X |
| SLOUCH | X | | | | X · | | X |
| PATTERN | | X | | | | | |
| BORDER DIST. | 124 | APPROX 100 * | APPROX 100 * | 98 * | APPROX 100 * | 70 | 235 |
| >100 AIR MILES | | | | | | | X |

**3.** In *United States v. Leija,* 735 F.Supp. 701 (N.D.Tex.1990), the court held that the Border Patrol agent lacked reasonable suspicion to stop an automobile 400 miles north of the Mexican border, even though the vehicle was large, contained passengers who were Hispanic in appearance, and appeared to be heavily loaded in the rear as though it was carrying persons in the trunk. The *Leija* court did not find that the long distance from the border created a *per se* limitation on the Border Patrol agent's authority to stop a vehicle. Instead, the court found that "a vital element of the *Brignoni–Ponce* test is whether the agent had reason to believe that the vehicle had come from the border." 735 F.Supp. at 705 (cites omitted). Although the agent testified that the place of the stop was a "major route for alien smuggling", the court held that due to the distance from the border and the fact that the agent had stopped ten vehicles of which only two were found to contain illegal aliens, "the case [is] to be decided solely on the remaining facts and circumstances with no further inferences to be drawn on the assumption that the travellers had come from the border." *Id.* at 706.

**4.** A chart comparing the totality of circumstances factors listed in *United States v. Brignoni–Ponce,* 422 U.S. at 884–886, 95 S.Ct. at 2582–2583, as discussed in the various Tenth Circuit cases which have interpreted it, and which were established in this case, is attached to this Memorandum Opinion and Order.

| CASE: | Leyba | Pollack | Mons. | Miranda | Barbee | Limas | Venzor |
|---|---|---|---|---|---|---|---|
| DOCU-MENTED ROUTE | YES | YES | YES | YES | YES | YES | YES |
| RESULT | C | C | U | .U | C | U | U |

KEY:
| | |
|---|---|
| X: | particular factor present in case |
| WINTER: | court has indicated that during winter months, travel is unusual on New Mexico's back roads |
| PATTERN: | car engaged in a "classic alien smuggling pattern" |
| BORDER DIST.: | number of road miles from the border that the stop occurred |
| DOCUMENTED ROUTE: | well-documented in the case itself or well known as an alien smuggling route |
| C: | stop held constitutional |
| U: | stop held unconstitutional; evidence suppressed |

* The stops in these four cases occurred at approximately the same location, i.e. the intersection of Highway 52, I–25 and U.S. Highway 85. According to *Miranda*, this is 98 miles from the United States–Mexican border.